**AMERICAN FINANCIAL SERVICES ASSOCIATION, Petitioner,**

v.

**FEDERAL TRADE COMMISSION, Respondent,**

**Silas Brown, et al., American Conference of Uniform Consumer Credit Code States, Intervenors.**

**The SOUTH CAROLINA DEPARTMENT OF CONSUMER AFFAIRS, Petitioner,**

v.

**FEDERAL TRADE COMMISSION, Respondent,**

**American Conference of Uniform Consumer Credit Code States, American Financial Services Association, Department of Commerce of the State of Montana, Intervenors.**

Nos. 84–1081, 84–1167.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 22, 1985.

Decided July 12, 1985.

Tamm, Circuit Judge, filed dissenting opinion.

David H. Remes, Washington, D.C., with whom William H. Allen, Washington, D.C., was on the brief, for petitioner/intervenor American Financial Services Ass'n in Nos. 84–1081 and 84–1167.

Steven W. Hamm, Columbia, S.C., with whom Philip S. Porter, Pickens, S.C., and J.M. Edouard Mille, Columbia, S.C., were on the brief, for petitioner South Carolina Dept. of Consumer Affairs in No. 84–1167. Philip S. Porter, Pickens, S.C., and J.M. Edouard Mille, Columbia, S.C., were also on the brief for intervenor American Conference of Uniform Consumer Credit Code States in Nos. 84–1081 and 84–1167.

Ernest J. Isenstadt, Asst. General Counsel, F.T.C., with whom Howard E. Shapiro, Deputy General Counsel, and Lawrence DeMille-Wagman, F.T.C., Washington, D.C., were on the brief, for respondent in Nos. 84–1081 and 84–1167.

J. Alan Galbraith, Washington, D.C., for intervenors Silas Brown, et al. in No. 84–1081. Charles Hill, Washington, D.C., entered an appearance for intervenors.

Francis X. Bellotti, Boston, Mass., was on the brief, for Com. of Mass., et al., amicus curiae, in Nos. 84–1081 and 84–1167. Rex Butler, Anchorage, Alaska, entered an appearance for amicus curiae in No. 84–1081.

Edwin Lloyd Pittman, Jackson, Miss., was on the brief for the Commissioner of Banking and Consumer Finance of the State of Miss., amicus curiae, in Nos. 84–1081 and 84–1167.

R. Stuart Broom, Washington, D.C., was on the brief for Nat. Ass'n of Consumer Credit Administrators, amicus curiae, in Nos. 84–1081 and 84–1167.

Before TAMM, WALD and EDWARDS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

Dissenting opinion filed by Circuit Judge TAMM.

WALD, Circuit Judge:

In these consolidated cases, the petitioners, American Financial Services Association (AFSA) and South Carolina Department of Consumer Affairs (SCDCA) seek

review of the Federal Trade Commission's ("the FTC" or "the Commission") Trade Regulation Rule on Credit Practices ("the Credit Practices Rule" or "the Rule"), pursuant to section 18(e) of the Federal Trade Commission Act ("the FTC Act"), 15 U.S.C. § 57a(e)(1)(A).[1] After thorough consideration of the record, we find the promulgation of the Credit Practices Rule was within the Commission's authority under sections 5(a)(1) and 18(a)(1)(B) of the FTC Act, that the Rule is supported by substantial evidence in the record, and that the Rule does not effect an unlawful preemption of state law.

## I. THE RULEMAKING AND PETITIONERS' CHALLENGE

The Commission's rulemaking on creditor remedies originated as a result of two national studies of consumer credit transactions. As part of the Consumer Credit Protection Act of 1968, Congress established the National Commission on Consumer Finance and charged it with conducting a study of consumer credit transactions including an assessment of existing regulatory measures to protect against unfair practices and to ensure the informed use of consumer credit. The National Commission on Consumer Finance's final report, based on an extensive survey, identified a number of abusive practices and recommended curtailment of a variety of boilerplate provisions commonly found in consumer credit contracts. *See* Consumer

Credit in the United States, Report of the National Commission on Consumer Finance (1972), Joint Appendix ("J.A.") at 3 [hereinafter cited as NCCF study]. Between 1972 and 1974, the FTC's Bureau of Consumer Protection also conducted an investigation of the consumer finance industry to determine whether the use of certain collection remedies was an unfair practice within the meaning of section 5 of the FTC Act. As a result of this investigation, the Bureau of Consumer Protection recommended that the FTC propose a trade regulation rule branding certain creditor remedies as unfair trade practices. *See* Memorandum to Commission from Division of Special Projects, Bureau of Consumer Protection, Creditor Remedies Project (April 1974), J.A. at 74 [hereinafter cited as Creditor Remedies Project].

On April 11, 1975, the Commission published its initial notice of rulemaking on consumer credit practices. Credit Practices Rule, 40 Fed.Reg. 16,347 (1975). The initial notice of rulemaking proposed a rule proscribing or restricting the use of eleven creditor practices or remedies: confessions of judgment; waivers of exemption; wage assignments; security interests in household goods; cross-collateralization; blanket security interests; resale of repossessed collateral; imposition of attorneys' fees in connection with debt collection; pyramiding of late charges; third party contacts; and co-signer liability. Following the comment and hearing stages of the rulemaking,[2] re-

---

1. Petitioner AFSA is an association of over 550 consumer finance and small-loan companies. Additional briefs in support of the petitioners were filed by intervenor American Conference of Uniform Consumer Credit Code States (ACUCCS) and amici the National Association of Consumer Credit Administrators and the Commissioner of Banking and Consumer Finance of the State of Mississippi. Additional briefs in support of the respondent were filed by intervenors Silas Brown, Community Thrift Clubs, Inc. and the National Consumer Law Center and amici the Attorneys General of Arkansas, Illinois, Kentucky, Maine, Massachusetts, Michigan, Minnesota, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Rhode Island, Tennessee and Wisconsin.

2. Numerous written comments were received through August 5, 1977. Included among the

commenters were banks, finance companies, retailers, credit unions, savings and loan associations, various trade associations, legal aid attorneys, consumer groups, governmental entities, and consumers. Banks and savings and loan institutions while not subject to the FTC's regulatory jurisdiction, nonetheless submitted comments because they are affected by the Credit Practices Rule. The Federal Reserve Board and the Federal Home Loan Bank Board are required to promulgate rules applicable to banks and saving and loan associations that are "substantially similar" to the FTC's rule within 60 days after the FTC's rule takes effect unless the Boards affirmatively find that the covered practices are not unfair or deceptive, or find that the rule would "seriously conflict with essential monetary and payments systems policies." *See* 15 U.S.C. § 57a(f)(1). The Federal Reserve Board published a "substantially similar" credit

ports were prepared and submitted to the Commission by the Presiding Officer, *see* Report of the Presiding Officer on Proposed Trade Regulation Rule: Credit Practices (August 1978), J.A. at 330 [hereinafter cited as P.O. Report], and by the Commission staff, *see* Credit Practices: Staff Report and Recommendation on Proposed Trade Regulation Rule (August 1980), J.A. at 704 [hereinafter cited as Staff Report]. The publication of the Staff Report triggered a 60-day comment period, *see* 16 C.F.R. § 1.13(h) (1985), which was extended until January 16, 1981. On April 14, 1983, the rulemaking staff's memorandum recommending a final modified proposed rule and memoranda from the Commission's Bureau of Economics and Bureau of Consumer Protection were placed on the public record.[3] Prior rulemaking participants were invited to present their views orally directly to the Commission on June 6 and 7, 1983. On June 13, 1983, the Commission met to consider whether to promulgate a rule and what form the rule should take. The Commission rejected several provisions of the rule and modified others.[4] On July

20, 1983, the Commission tentatively adopted, by unanimous vote, the revised proposed rule. The final rule was published on March 1, 1984, to become effective March 1, 1985. Credit Practices Rule, 49 Fed.Reg. 7740 (1984) (codified at 16 C.F.R. pt. 444). In sum, the Credit Practices Rule was painstakingly considered and significantly modified in response to the extensive comments and recommendations received during this long rulemaking proceeding.

The Credit Practices Rule as finally promulgated contains provisions relating to the following creditor remedies: confessions of judgment; wage assignments; security interests in household goods; waivers of exemption; pyramiding of late charges; and cosigner liability. Petitioners, as a whole, specifically challenge the provisions relating to wage assignments and security interests in household goods. The challenged provisions read in pertinent part:

> (a) In connection with the extension of credit to consumers in or affecting com-

practices rule on May 8, 1985. *See* 50 Fed.Reg. 19,325 (1985) (to be codified at 12 C.F.R. pt 535).

 A final notice of rulemaking was published on June 24, 1977, 42 Fed.Reg. 32,259 (1977), setting forth a schedule of public hearings and enumerating 14 issues for consideration designated by the Presiding Officer pursuant to 16 C.F.R. § 1.13(d)(1) (1985). The hearings were conducted between September 12, 1977, and January 30, 1978, in Dallas, Texas, Chicago, Illinois, San Francisco, California, and Washington, D.C. Rebuttal submissions were then received until May 1, 1978.

**3.** *See* Memorandum to the Commission from Division of Credit Practices (July 20, 1981) (Staff's Final Recommendations on the Proposed Credit Practices Trade Regulation Rule), J.A. at 1581 [hereinafter cited as Staff's Final Recommendations]; Memorandum to Commission from Timothy Muris, Director of Bureau of Consumer Protection (April 4, 1983) ("Muris Memorandum"), J.A. at 1823; Memorandum to Commission from Richard Higgins, Deputy Director of Bureau of Economics (April 5, 1983) ("Higgins Memorandum"), J.A. at 1876; Memorandum to Commission from Division of Consumer Protection, Bureau of Economics (April 7, 1983), J.A. at 1892 [hereinafter cited as Bureau of Economics Final Recommendations];

Memorandum to Commission from Wendy Lee Gramm, Director of Bureau of Economics (April 7, 1983) ("Gramm Memorandum"), J.A. at 1932.

**4.** The Commission rejected draft provisions governing the resale of repossessed collateral, the imposition of attorneys' fees in connection with debt collection, a practice known as cross collateralization, and creditor contacts with third parties. *See* 40 Fed.Reg. 16,347 (April 11, 1975) (originally proposed rule, relevant sections to be codified at 16 C.F.R. § 444.2(a)(5), (7), (8), (10)); *see also* 49 Fed.Reg. at 7783–87 (explaining rejection of provisions relating to resale of repossessed collateral and third party contacts); Staff Report, J.A. at 965–1182, 1195–1237 (discussing objections to proposed provisions ultimately rejected). The household goods provision was substantially modified to provide a narrow definition of household goods covering only "common household necessities" and to make clear that the provision only applied to non-possessory security interests. *See* 49 Fed. Reg. at 7767–68. The scope of the original wage assignment provision was similarly narrowed to exclude from its coverage revocable wage assignments, preauthorized payroll deduction plans, and already earned wages. In addition a definition of "earnings" was added. *See* 49 Fed. Reg. at 7760–61.

merce, as commerce is defined in the Federal Trade Commission Act, it is an unfair act or practice within the meaning of Section 5 of that Act for a lender or retail installment seller directly or indirectly to take or receive from a consumer an obligation that:

. . . .

. . . .

(3) Constitutes or contains an assignment of wages or other earnings unless:

(i) The assignment by its terms is revocable at the will of the debtor, or

(ii) The assignment is a payroll deduction plan or preauthorized payment plan, commencing at the time of the transaction, in which the consumer authorizes a series of wage deductions as a method of making each payment, or

(iii) The assignment applies only to wages or other earnings already earned at the time of the assignment.

(4) Constitutes or contains a nonpossessory security interest in household goods other than a purchase money security interest.

16 C.F.R. § 444.2(a)(3)–(4). Household goods are defined as:

(i) . . . Clothing, furniture, appliances, one radio and one television, linens, china, crockery, kitchenware, and personal effects (including wedding rings) of the consumer and his or her dependents, provided that the following are not included within the scope of the term "household goods":

(1) Works of art;

(2) Electronic entertainment equipment (except one television and one radio);

(3) Items acquired as antiques; and

(4) Jewelry (except wedding rings).

(j) *Antique.* Any item over one hundred years of age, including such items that have been repaired or renovated without changing their original form or character.

16 C.F.R. § 444.1(i)–(j).

A non-purchase, non-possessory security interest in household goods ("HHG security interest") allows the creditor to seize and sell the debtor's household goods upon default without a judgment or court order. Similarly, a wage assignment allows the creditor to file the assignment with the debtor's employer and receive all or part of the debtor's wages until the debt is satisfied without first obtaining a court judgment. The Commission found that both these creditor remedies were "unfair" because they cause substantial and unavoidable injury to consumers which is not outweighed by countervailing benefits to consumers or competition. Petitioners argue that the Rule is beyond the Commission's section 5 authority to proscribe unfair practices because in the absence of seller overreaching in the form of deceit, coercion or nondisclosure of material information, the FTC may not intercede in the market as an "invisible hand" to obtain "better bargains" for consumers.

■ The petitioners' challenges to the household goods and wage assignment provisions of the Credit Practices Rule raise the following issues [5]:

---

**5.** Petitioner AFSA argues that even if the challenged provisions of the Rule are found to be valid exercises of FTC authority, the court should still remand the Rule for further consideration in light of changes which have occurred in the consumer credit market since the bulk of the rulemaking record was compiled. AFSA Brief at 71–74 (citing the enactment of the Bankruptcy Reform Act of 1978; the increase in use of second mortgages for non-housing related loans; the emergence of banks as a stronger competitor in the consumer credit market; and the deregulation of state interest rate ceilings). Courts generally are reluctant to base a remand on the ground that the evidence has grown stale. *American Optometric Ass'n v. FTC,* 626 F.2d 896,

906–07 (D.C.Cir.1980) (remand warranted due to intervening Supreme Court decision while judicial review of rule was pending). In *American Optometric,* this court recognized that the equities of a situation may militate in favor of a remand " 'where there has been a change in circumstances . . . that is not merely "material" but rises to the level of a change in "core" circumstances, the kind of change that goes to the very heart of the case.' " 626 F.2d at 907 (quoting *Greater Boston Television Corp. v. FCC,* 463 F.2d 268, 283 (D.C.Cir.1971), *cert. denied,* 406 U.S. 950 (1972)). AFSA has cited no "core" change in circumstances which go to "the very heart of the case." In fact, AFSA acknowledges

(1) Has the FTC exceeded its statutory authority to define unfair acts or practices under section 5(a)(1) of the FTC Act?

(2) Has the FTC exceeded its rulemaking authority under section 18(a)(1)(B) of the FTC Act by failing to define with specificity the acts or practices deemed unfair?

(3) Are the Commission's unfair practice determinations supported by substantial evidence in the rulemaking record?

(4) Has the Commission exceeded its authority by providing an overly broad remedy for preventing the identified unfair practice?

(5) Has the Commission exceeded its authority by preempting state laws and regulations governing consumer credit transactions? [6]

## II. SCOPE OF FTC AUTHORITY UNDER THE UNFAIRNESS DOCTRINE

Petitioners claim that in promulgating the challenged provisions of the Credit Practices Rule, the FTC acted beyond its statutory authority to define unfair acts and practices and to promulgate rules proscribing those acts or practices under sections 5 and 18 of the FTC Act. In order to evaluate petitioners' claims within the proper perspective, the development and current status of the FTC's unfairness authority must be recounted. As this court stated in *National Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672, 674 (D.C.Cir.1973),

that none of the intervening developments cited provide any "decisive answers" to the Commission's stated justifications for the Rule. AFSA Brief at 73. AFSA merely asserts that *if the purported effects* of the new developments *were confirmed as true* then certain portions of the FTC's reasoning may be undercut. On the other hand, the effects of the new developments cited may bolster the Commission's reasoning. *See* FTC Brief at 70–71. Moreover, the staff's final recommendations on the Rule included a discussion of the impact of developments in the credit market since the completion of the hearings. *See* Staff's Final Recommendations, J.A. at 1601–08. Thus subsequent developments were not completely overlooked by the Commission. AFSA has not carried the heavy burden of showing a change in "core" circumstances necessitating a remand. *Cf. ICC v. Jersey City*, 322

*cert. denied*, 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974): "The Federal Trade Commission is a creation of Congress, not a creation of judges' contemporary notions of what is wise policy. The extent of its powers can be decided only by considering the powers Congress specifically granted it in the light of the statutory language and background." (citations omitted).

### A. Evolution of the FTC's Authority to Identify and Proscribe Unfair Practices

Congress created the FTC in 1914 and delegated to it the power to determine and prevent "unfair methods of competition" in commerce. Federal Trade Commission Act, ch. 311, § 5, 38 Stat. 719 (1914) (current version at 15 U.S.C. § 45(a)(1)). At the time of this original delegation, Congress explicitly rejected enacting a statutory definition of the term "unfair methods of competition." *See* S.Rep. No. 597, 63d Cong., 2d Sess. 13 (1914) ("The committee gave careful consideration to ... whether it would attempt to define the many and variable unfair practices which prevail in commerce ... or whether it would ... leave it to the commission to determine what practices were unfair. It concluded that the latter course would be better...."). Congress' rationale is clearly articulated in the House Conference Report:

U.S. 503, 514, 64 S.Ct. 1129, 1134, 88 L.Ed. 1420 (1944) ("If upon the coming down of the order litigants might demand rehearings as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening.").

**6.** While only specifically challenging the household goods provision of the Rule, petitioner SCDCA appears to make a broader preemption challenge claiming that the Credit Practices Rule as a whole gratuitously supplants South Carolina's comprehensive consumer credit laws. The preemption challenge is addressed *infra* at Part IV.

It is impossible to frame definitions which embrace all unfair practices. There is no limit to human inventiveness in this field. Even if all known unfair practices were specifically defined and prohibited, it would be at once necessary to begin over again. If Congress were to adopt the method of definition, it would undertake an endless task. It is also practically impossible to define unfair practices so that the definition will fit business of every sort in every part of this country. Whether competition is unfair or not generally depends upon the surrounding circumstances of the particular case. What is harmful under certain circumstances may be beneficial under different circumstances.

H.R.Conf.Rep. No. 1142, 63d Cong., 2d Sess. 19 (1914).

This broad grant of discretionary authority led to two early judicial attempts to cabin the FTC's authority to define unfair practices by limiting the covered practices to those which unduly hinder competition or tend to create monopolies. *See, e.g.,* *FTC v. Raladam Co.,* 283 U.S. 643, 51 S.Ct. 587, 75 L.Ed. 1324 (1931); *FTC v. Gratz,* 253 U.S. 421, 40 S.Ct. 572, 64 L.Ed. 993 (1920). Subsequent judicial and congressional action, however, overturned these attempts to narrowly circumscribe the FTC's authority.

In *FTC v. R.F. Keppel & Bro., Inc.,* 291 U.S. 304, 54 S.Ct. 423, 78 L.Ed. 814 (1934), the FTC issued a cease and desist order under section 5 to prevent a manufacturer from selling candy using a marketing method which tempted children to gamble even though the marketing scheme involved no fraud or deception and could be adopted by competing manufacturers. In finding the practice contrary to public policy and thus unfair within the meaning of section 5, the Supreme Court stated:

[W]e cannot say that the Commission's jurisdiction extends only to those types of practices which happen to have been litigated before this court.

Neither the language nor the history of the Act suggests that Congress intended to confine the forbidden methods to fixed and unyielding categories.

*Id.* at 309–10, 54 S.Ct. at 425.

■ Congress confirmed the Supreme Court's view of the FTC's authority by enacting the Wheeler-Lee Amendment in 1938. Ch. 49, § 3, 52 Stat. 111 (1938) (codified at 15 U.S.C. § 45(a)). This amendment broadened the language of section 5 to read:

The Commission is empowered and directed to prevent persons, partnerships, or corporations ... from using unfair methods of competition in commerce and *unfair or deceptive acts or practices in commerce.*

15 U.S.C. § 45(a)(6) (emphasis added to indicate amended language). One of the primary purposes of this amendment was "to broaden the powers of the Federal Trade Commission over unfair methods of competition by extending its jurisdiction to cover unfair or deceptive acts or practices in commerce." H.R.Rep. No. 1613, 75th Cong., 1st Sess. 1 (1937). The amendment was engendered in large measure by judicial decisions limiting the FTC's authority to practices unfairly inhibiting competition. *Id.* at 3 (discussing *Raladam* decision); 83 Cong.Rec. 395 (1938) ("The trouble arises, and is continually increasing from court decisions construing the language of the existing law. These accumulated decisions over a period of years have so hedged in the Commission that there is great need for amendments of an enlarging character if the full effectiveness of the objects sought are to be attained."). Congress' intent was affirmatively to grant the Commission authority to protect consumers as well as competitors.

By the proposed amendment to section 5, the Commission can prevent such acts or practices which injuriously affect the general public as well as those which are unfair to competitors. In other words, this amendment makes the consumer, who may be injured by an unfair trade practice, of equal concern, before the law, with the merchant or manufacturer

injured by the unfair methods of a dishonest competitor.

H.R.Rep. No. 1613, 75th Cong., 1st Sess. 3 (1937).

Despite the passage of the Wheeler-Lee Amendment in 1938, Congress found that "the FTC continued to be hampered as an effective force in promoting fair and free competition and safeguarding the consumer public against unfair or deceptive acts or practices by the scope of its authority being limited to matters 'in commerce' and by being made to rely solely on the cease and desist order procedure for enforcement." H.R.Rep. No. 1107, 93d Cong., 2d Sess. 29 (1974) U.S.Code Cong. & Admin.News 1974, pp. 7702, 7712. House Report No. 1107 noted the growing consumer consciousness which had developed during the sixties and cited two oversight studies of the FTC which were extremely critical of the FTC's lack of effectiveness in carrying out its consumer protection responsibilities. *Id.* at 33–34 (citing American Bar Association, Report of the Commission to Study the Federal Trade Commission (1969); E. Cox, R. Felimuth & J. Schulz, "The Nader Report" on the Federal Trade Commission (1969)). "Both reports noted the need for additional statutory authority to permit the FTC to carry out its consumer protection responsibilities." *Id.* at 34, U.S.Code Cong. & Admin.News 1974, p. 7716. Congress thus enacted the Magnuson-Moss Warranty—Federal Trade Commission Improvement Act "to codify the Commission's authority to make substantive rules for unfair or deceptive acts or practices in or

affecting commerce." [7] H.R.Conf.Rep. No. 1606, 93d Cong., 2d Sess. 31 (1974). The conferees regarded this "as an important power by which the Commission can fairly and efficiently pursue its important statutory mission." *Id.* The Magnuson-Moss Act added section 18 to the FTC Act, 15 U.S.C. § 57a, which provides:

(1) ... [T]he Commission may prescribe—

(A) interpretive rules and general statements of policy with respect to unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 45(a)(1) of this title), and

(B) rules which define with specificity acts or practices which are unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 45(a)(1) of this title).... Rules under this subparagraph may include requirements prescribed for the purpose of preventing such acts or practices. [8]

15 U.S.C. § 57a(a)(1)(A), (B).

B. *Discerning Limits on the FTC's Authority to Define Unfair Practices*

 While both the Wheeler-Lee Amendment and the Magnuson-Moss Act legitimized and facilitated the Commission's consumer protection activities, neither shed much light on the standards to be used in identifying unfair acts or practices. Congress has not at any time withdrawn the broad discretionary authority originally granted the Commission in 1914 to define unfair practices on a flexible, incremental basis. [9] Courts have accordingly adopted a

---

**7.** This court in *National Petroleum Refiners Ass'n,* 482 F.2d 672, had construed section 6(g) of the FTC Act, 15 U.S.C. § 46(g), as conferring upon the Commission the authority to promulgate substantive trade regulation rules.

**8.** The Magnuson-Moss Act also amended section 5, 15 U.S.C. § 45(a)(1), to include the term "or affecting commerce." Section 5(a)(1) currently reads:

Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful.

**9.** The most Congress has done to constrict the FTC's authority to make unfairness determina-

tions is to impose special procedural requirements. For example, the Magnuson-Moss Act granted the Commission rulemaking authority but imposed upon the Commission rulemaking procedures and judicial review provisions stricter than those contained in the Administrative Procedure Act. The House Committee wrote:

Your committee believes these [APA] rulemaking procedures and this scope of judicial review may be inadequate in some cases where fundamental factual premises of a rule are at issue. Because of the potentially pervasive and deep effect of rules defining what constitutes unfair or deceptive acts or practices and the broad standards which are set by the words "unfair or deceptive acts or practic-

malleable view of the Commission's authority. *See, e.g., FTC v. Sperry & Hutchinson Co.,* 405 U.S. 233, 244, 92 S.Ct. 898, 905, 31 L.Ed.2d 170 (1972) (comparing FTC to a court of equity in carrying out implementation of the "elusive, but congressionally mandated standard of fairness"); *Atlantic Refining Co. v. FTC,* 381 U.S. 357, 367, 85 S.Ct. 1498, 1505, 14 L.Ed.2d 443 (1965) (Congress intentionally left the development of the term "unfair" to the Commission); *R.F. Keppel & Bro.,* 291 U.S. at 310, 54 S.Ct. at 425 (Congress did not intend to confine forbidden practices to "fixed and unyielding categories"). Nonetheless as this court has stated: "The Commission is hardly free to write its own law of consumer protection...." *National Petroleum Refiners Ass'n,* 482 F.2d at 693. The Commission's exercise of its unfairness authority in any particular instance is subject to judicial review and may be affirmed or set aside by the court. *See Sperry & Hutchinson,* 405 U.S. at 249, 92 S.Ct. at 907; *R.F. Keppel & Bro.,* 291 U.S. at 314, 54 S.Ct. at 427.

■ The judiciary remains the final authority with respect to questions of statutory construction and must reject administrative agency actions which exceed the agency's statutory mandate or frustrate congressional intent. *See, e.g., FEC v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981); *Volkswagenwerk v. FMC,* 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968); *NLRB v. Brown,* 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965); *FTC v. Colgate-Palmolive Co.,* 380 U.S. 374, 385, 85 S.Ct. 1035, 1042, 13 L.Ed.2d 904 (1965). The Supreme Court has made clear, however, that in reviewing an agency's construction of a statute which it administers, courts must give deference to the agency's interpretation:

If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* — U.S. ——, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *see also Colgate-Palmolive Co.,* 380 U.S. at 385, 85 S.Ct. at 1042 ("This Court has frequently stated that the [FTC's] judgment is to be given great weight by reviewing courts."). Thus we must perform our "quintessential" judicial function of determining whether the Commission has acted within the bounds of its statutory authority while at the same time according due deference to the Commission's judgment as to what constitutes an unfair practice. We do not understand the dissent to disagree with the foregoing principles of judicial review. *See* Dissent at 991–992. We are consequently taken aback by its characterization of our performance as being "anesthetized" by deference to the Commission. *See* Dissent at 998. In our view, it is the dissent that would stray outside the established bounds of judicial review and effectively usurp the role of the FTC. The dissent presents its own *selective* review of the Commission's stated rationale while disregarding the totality of the Commission's reasoning, and ultimately supplants the final judgment of all five Commissioners with respect to the wisdom of their determination that the taking of HHG security interests and wage assignments are unfair creditor practices. We decline to view our role so broadly. *See Atlantic Refining Co.,* 381 U.S. at 367, 85 S.Ct. at 1505 ("[O]ur function is limited to determining whether the Commission's decision 'has "warrant in the record" and a reasonable

es", the committee believes greater procedural safeguards are necessary. Accordingly, it has fashioned the rulemaking procedures and judicial review provisions described below which we believe to be more appropriate in

this context than merely relying upon the provisions of sections 553 and 706 of title 5. H.R.Rep. No. 1107, 93d Cong., 2d Sess. 45–46 (1974), U.S.Code Cong. & Admin.News 1974, p. 7727.

basis in law.' ") (quoting *NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 131, 64 S.Ct. 851, 860, 88 L.Ed. 1170 (1944)).

The broad delegation of discretionary authority to the FTC to define unfair practices makes our task particularly difficult in this case. In ascertaining whether the FTC has exceeded the limits of its statutory authority by defining HHG security interests and wage assignments as unfair creditor practices we would be materially aided by a particularization of the congressionally intended legal standard for assessing the fairness of particular acts or practices. Yet, Congress has expressly declined to delineate such a legal standard claiming that the standard must be stated in broad terms to allow the Commission to respond to evolving market conditions and practices. If that were Congress' last word, the court would be left with two equally unattractive alternatives: articulating a legal standard of unfairness which Congress has expressly refused, on policy grounds, to articulate or deciding the reasonableness of the Commission's unfairness determination based on our own views of what should be deemed an unfair practice without benefit of any concrete standards for judgment. Fortunately recent interactions between Congress and the Commission provide the court with some tangible guideposts for review.

Considerable controversy developed during the mid to late seventies over the FTC's exercise of its consumer unfairness regulatory authority. Spurred on by the criticisms in the late sixties of the Commission's lack of effectiveness in the realm of consumer protection, the prodding of congressional committees, and the passage of the Magnuson-Moss Act, the Commission vigorously stepped up its consumer protection activities under its unfairness regulatory authority. *See supra* p. 967; H.R. Rep. No. 809, Pt. 1, 97th Cong., 2d Sess. 10–11 (1982). The Commission's new activism engendered commentators' criticism of the vagueness and breadth of the unfairness doctrine.[10] The controversy over the Commission's consumer protection activities peaked in the late-1970's with the Commission's particularly controversial foray into regulation of television advertising directed at children; the proposed rule would have completely prohibited the advertising of certain products during "children's programming." [11]

In response to this controversy, Congress enacted the Federal Trade Commission Improvements Act of 1980, Pub.L. No. 96–252, 94 Stat. 374 (codified as amended in scattered sections of 15 U.S.C.) which suspended the Commission's controversial rulemaking on children's advertising and placed a moratorium on the initiation of any new rulemakings aimed at regulating commercial advertising as an unfair prac-

10. *See, e.g.,* Erxleben, The FTC's Kaleidoscopic Unfairness Statute: Section 5, 10 Gonz.L.Rev. 333 (1975); Nelson, The Politicization of FTC Rulemaking, 8 Conn.L.Rev. 413 (1976); Schwartz, Regulating Unfair Practices Under the FTC Act: The Need for a Legal Standard of Unfairness, 11 Akron L.Rev. 1 (1977).

11. *See* Children's Advertising, Notice of Proposed Rulemaking, 43 Fed.Reg. 17,967 (1978). The trade regulation rule proposed by the FTC staff was an attempt to deal comprehensively with the entire area of television advertising to children. The proposed rule included three elements:

 (a) Ban all televised advertising for any product which is directed to, or seen by, audiences composed of a significant proportion of children who are too young to understand the selling purpose of or otherwise comprehend or evaluate the advertising;

 (b) Ban televised advertising for sugared food products directed to, or seen by, audiences composed of a significant proportion of older children, the consumption of which products poses the most serious dental health risks;

 (c) Require televised advertising for sugared food products not included in Paragraph (b), which is directed to, or seen by, audiences composed of a significant proportion of older children, to be balanced by nutritional and/or health disclosures funded by advertisers.

*Id.* at 17,969. In addition, the Commission requested comments on a number of broad remedial measures, including requiring advertisers of highly carciogenic products to fund separate advertisements disclosing the products risks and nutritional value. *Id.*

tice pending congressional oversight hearings.[12] Although Congress has subsequently solicited statements and held oversight hearings on the question of whether the FTC's unfairness authority should be eliminated or permanently restricted,[13] it has taken no definitive legislative action to define the limits of that authority. Bills were introduced in both the 97th and 98th Congresses which would have amended section 5 to provide a definition of unfair acts or practices.[14] The definition proposed in these bills was the definition supplied by the Commission at the request of Congress in a 1980 policy statement. *See* Letter from Federal Trade Commission to Senators Ford and Danforth (Dec. 17, 1980), *reprinted in* H.R.Rep. No. 156, Pt. 1, 98th Cong., 1st Sess. 33–40 (1983) [hereinafter

cited as Policy Statement with page references to H.R.Rep. No. 156].

In its Policy Statement, subscribed to by all five Commissioners, the FTC responded to the criticism levelled at the Commission's implementation of its unfairness authority by delineating a concrete framework for the future application of that authority. *See* Policy Statement at 34 ("This letter thus delineates the Commission's view of the boundaries of its consumer unfairness jurisdiction and is subscribed to by each Commissioner."). The Commission noted that Congress by framing section 5 in general terms expected the underlying criteria to evolve and develop over time, thus, "[t]he present understanding of the unfairness standard is the result of an evo-

---

**12.** Congress' limitation of the Commission's unfairness authority with respect to commercial advertising was motivated by the threat the FTC's broad industry-wide rulemaking authority posed to first amendment interests in the area of commercial speech. *See* H.R.Conf.Rep. 917, 96th Cong., 2d Sess. 32 (1980) ("The conference made these amendments regarding the children's advertising proceeding because of their concern that it raises fundamental issues of free speech and due process. The conferees expect the Commission to seriously weigh these concerns in further proceedings, if any.").

The FTC Improvements Act of 1980 also provided for a two house legislative veto, whereby a FTC trade regulation rule could be overturned by adoption within 90 days of a concurrent resolution disapproving the rule. This veto provision was subsequently declared unconstitutional by this court. *See Consumers Union, Inc. v. FTC,* 691 F.2d 575 (D.C.Cir.1982).

**13.** *See* Senate Comm. on Commerce, Science, and Transportation, 96th Cong., 2d Sess., Unfairness: Views on Unfair Acts and Practices in Violation of the Federal Trade Commission Act (Comm. Print 1980) (collection of public comments); Federal Trade Commission Reauthorization, Hearings Before the Subcomm. on Commerce, Transportation, and Tourism of the House Comm. on Energy and Commerce, 97th Cong., 2d Sess. (1982); Reauthorization of the Federal Trade Commission, Hearings Before the Senate Comm. on Commerce, Science, and Transportation, 97th Cong., 2d Sess. (1982); Federal Trade Commission Reauthorization— 1983, Hearings Before the Subcomm. on Commerce, Transportation and Tourism of the House Comm. on Energy and Commerce, 98th Cong., 1st Sess. (1983); Federal Trade Commission Reauthorization, Hearings Before the Sen-

ate Comm. on Commerce, Science, and Transportation, 98th Cong., 1st Sess. (1983).

**14.** *See* S. 1714, 98th Cong., 2d Sess. (1983) (reprinted and discussed in S.Rep. No. 215, 98th Cong., 1st Sess. (1983)); H.R. 2970, 98th Cong., 2d Sess. (1983) (reprinted and discussed in H.R. Rep. No. 156, Pts. I–III, 98th Cong., 2d Sess. (1983)); S. 2449, 97th Cong., 2d Sess. (1982) (reprinted and discussed in S.Rep. No. 451, 97th Cong., 2d Sess. (1982)); H.R. 6995, 97th Cong., 2d Sess. (1982) (discussed in H.R.Rep. No. 809, Pts. 1–2, 97th Cong., 2d Sess. (1982)). These proposed bills sought to codify Commission policy and to provide added procedural safeguards to parties subject to FTC jurisdiction. The bills were not aimed at diminishing the Commission's authority to vigorously protect consumers. For example, House Report 809, Pt. 1 states:

> It would be a mistake, however, to interpret the provisions of the bill as designed to hobble the Commission or transform it back into the timid agency that was pilloried for its caution in the 1960's. The Committee has carefully considered all views from a wide range of business and consumer groups submitted in connection with this reauthorization. While the Committee seeks to codify certain current Commission policies and perfect the procedural safeguards available to those who are subject to Commission jurisdiction, the Committee is aware of no evidence that the need for vigorous protection of competition and consumer rights has diminished. On the contrary, the record is replete with indications from consumers, business, labor and state attorneys general, of the need for continued vigorous FTC enforcement.

H.R.Rep. No. 809, Pt. 1, 97th Cong., 2d Sess. 11 (1982).

lutionary process." *See* Policy Statement at 35. The Commission's Policy Statement was basically a refinement of an earlier three-part standard of unfairness it had set out in 1964.

In 1964 the Commission determined that enough cases had been decided to enable the Commission to identify three criteria used in determining whether a practice, which is neither anticompetitive nor deceptive, is nonetheless unfair to consumers.

(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some commonlaw, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).

Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking, Statement of Basis and Purpose, 29 Fed.Reg. 8355 (1964). The Commission noted that the Supreme Court cited these criteria with apparent approval in *Sperry & Hutchinson*, 405 U.S. at 244–45 n. 5, 92 S.Ct. at 905–906 n. 5. *See* Policy Statement at 36 & n. 9 (citing *Spiegel, Inc. v. FTC*, 540 F.2d 287, 293 n. 8 (7th Cir. 1976); *Heater v. FTC*, 503 F.2d 321, 323 (9th Cir.1974)). The Supreme Court appended footnote 5, citing what have come to be termed the "S & H criteria," to the following statement comparing the FTC to a court of equity:

[T]he Federal Trade Commission does not arrogate excessive power to itself if, in measuring a practice against the elusive, but congressionally mandated standard of fairness, it, like a court of equity, considers public values beyond simply those enshrined in the letter or encompassed in the spirit of the antitrust laws.

*Sperry & Hutchinson*, 405 U.S. at 244, 92 S.Ct. at 905. In *Sperry & Hutchinson*, the Supreme Court thus put its stamp of approval on the Commission's evolving use of a consumer unfairness doctrine not moored in the traditional rationales of anticompetitiveness or deception.[15]

In its 1980 policy statement addressed to Congress, the Commission stated that since *Sperry & Hutchinson*, "the Commission has continued to refine the standard of unfairness in its cases and rules, and it has now reached a more detailed sense of both the definition and the limits of these criteria." Policy Statement at 36. The Commission set forth the following standard for identifying practices which are unfair to consumers:

To justify a finding of unfairness the injury must satisfy three tests. It must be substantial; it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and it must be an injury that consumers themselves could not reasonably have avoided.

*Id.* It was this standard that the Commission relied on in determining that the taking of HHG security interests and wage assignments were unfair practices. *See* Credit Practices Rule, 49 Fed.Reg. at 7743.

While the Commission's three-part unfairness standard sets forth an abstract definition of unfairness focusing on "unjustified consumer injury," it does little towards delineating the specific "kinds" of practices or consumer injuries which it encompasses.[16] Yet petitioners' challenge in

---

**15.** The Commission's reliance on a consumer unfairness rationale as an independent basis for its actions is of comparatively recent origin. More often the Commission's actions have been based on alternate theories of deception and unfairness. *See generally* Averitt, The Meaning of "Unfair Acts or Practices" in Section 5 of the Federal Trade Commission Act, 70 Geo.L.J. 225 (1981); Craswell, The Identification of Unfair Acts and Practices By the Federal Trade Commission, 1981 Wis.L.Rev. 107.

**16.** This deficiency has been noted by commentators. Two members of the Commission's Office of Planning have written articles attempting to clarify the implementation of the standard. *See* Averitt, *supra* note 15 (suggesting that the Commission's unfairness jurisdiction is best viewed in terms of consumer sovereignty—actionable

this case raises the exact question left open by the Commission's standard—what specific types of unfair practices and resultant consumer injuries are cognizable? Petitioners' claim that the Commission has exceeded its statutory authority to proscribe unfair practices is predicated on their arguments that the FTC has no authority to proscribe the "kinds" of practices or prevent the "kinds" of consumer injury at issue in this case. Thus despite the Policy Statement's purpose of providing greater certainty in application of the unfairness doctrine, it falls short of providing any concrete guidance to the court in resolving the issues raised by petitioners in this case. To date, however, the consumer injury test is the most precise definition of unfairness articulated by either the Commission or Congress.[17] Thus we determine the validity of the Commission's actions by reviewing the reasonableness of the Commission's application of the consumer injury test to the facts of this case, and the consistency of that application with congressional policy and prior Commission precedent. *See Atlantic Refining Co.*, 381 U.S. at 367, 85 S.Ct. at 1505 ("Where the Congress has provided that an administrative agency initially apply a broad statutory term to a particular situation, our function is limited to determining whether the Commission's decision 'has "warrant in the record" and a reasonable basis in law.' ") (quoting *NLRB*

*v. Hearst Publications, Inc.*, 322 U.S. 111, 131, 64 S.Ct. 851, 860, 88 L.Ed. 1170 (1944)).

## C. *The FTC's Exercise of Unfairness Authority Under Section 5(a)*

Applying the three-part consumer unfairness standard, the Commission found that HHG security interests and wage assignments were unfair creditor remedies because they caused substantial, unjustified consumer injury. Our analysis begins with a review of the Commission's reasoning with respect to each of the three criteria set out in the consumer unfairness standard.

### 1. *Substantial Injury*

In elaborating the term "substantial injury" in its Policy Statement, the Commission stated that in most cases substantial injury would involve monetary harm and that "ordinarily" "emotional impact and other more subjective types of harm" would not make a practice unfair. *See.* Policy Statement at 36. The Commission further clarified that it "is not concerned with trivial or merely speculative harms." *Id.* "An injury may be sufficiently substantial, however, if it does a small harm to a large number of people, or if it raises a significant risk of concrete harm." *Id.* at n. 12. With these guidelines [18] in mind, we turn to the specif-

---

injury arises from practices which undermine a consumer's ability to choose freely from a range of options); Craswell, *supra* note 15 (cataloguing the "kinds" of commercial practices which have been determined to be unfair in past Commission decisions). Other commentators have disparaged the Policy Statement precisely for its failure to provide an adequately workable "legal standard" to guide the FTC or the courts. *See, e.g.,* Gellhorn, Trading Stamps, S & H, and the FTC's Unfairness Doctrine, 1983 Duke L.J. 903, 957 ("Without a more explicit economic focus, however, this modification still allows the FTC and the courts to roam freely in applying the unfairness doctrine."); Rice, Consumer Unfairness at the FTC: Misadventures in Law and Economics, 52 Geo.Wash.L.Rev. 1, 56 (1984) (providing an economic perspective on the proposed consumer-injury test and suggesting that it provides "no guidance for the identification of factors that focus and aid the reasoned determination of the issue of legality in specific situations").

**17.** The Fourth Circuit appears to be the only appellate court to date which has reviewed an FTC unfairness rulemaking undertaken pursuant to the Policy Statement's three-part consumer injury standard. *See Harry & Bryant Co. v. FTC,* 726 F.2d 993, 999–1000 (4th Cir.) (upholding FTC unfairness determination), *cert. denied,* — U.S. ——, 105 S.Ct. 91, 83 L.Ed.2d 37 (1984). Contrary to the dissent's assertion, *see* Dissent at note 1, we are entirely consistent in our stated views regarding the Policy Statement. While the Policy Statement does provide "some tangible guideposts for review," *supra* p. 969, upon which we rely, *see infra* pp. 972–78, it nonetheless falls short of providing *definitive* answers to the issues raised by petitioners in this case.

**18.** In a 1982 letter to Senators Packwood and Kasten, FTC Chairman Miller reiterated the Commission's view on what constitutes a substantial injury:

ic injuries found to result from HHG security interests and wage assignments.

(a) *Security interests in household goods.* In return for credit, consumers may be required to give a non-possessory security interest in their household goods and personal effects. These goods may be seized by the creditor in the event of a default. *See* Credit Practices Rule, 49 Fed. Reg. at 7761. Such non-possessory security interests were not recognized at common law and are of comparatively recent origin. *Id.* Based on the rulemaking record, the Commission found the practice of securing loans with non-purchase, non-possessory security interests in household goods to be widespread, with finance companies being the preeminent users. *Id.* at 7762. HHG security interests may be created by simply checking a box labelled "chattel mortgage" or by other general provisions in the text of standard form contracts, thus, giving consumers little notice of the nature and extent of the collateral they are pledging. *Id.*

Based on evidence in the record, including the testimony of a large majority of industry witnesses, the Commission found that HHG security interests have little, if any, economic value to creditors. The creditors cannot ordinarily recover their loss on default by seizing and selling the goods. Consequently actual seizure of household goods by creditors is rare. The Commission summarized its findings as follows:

> The record reflects the fact that creditors rarely engage in actual repossession of household goods. When it does occur, the furniture and other items seized frequently have little or no economic value;

As a federal body the Commission believes its concerns should be with substantial injuries; its resources should not be used for trivial or speculative harm. As a general proposition, substantial injury involves economic or monetary harm and does not cover subjective examples of harm such as emotional distress or offenses to taste or social belief. *See* Letter from FTC Chairman J.C. Miller, III to Senator Packwood and Senator Kasten (March 5, 1982), *reprinted in* H.R.Rep. No. 156, Pt. 1, 98th Cong., 1st Sess. 27, 32 (1983) [hereinafter cited at 1982 Policy Letter with page references to H.R.Rep. No. 156].

occasionally, the act of seizure appears to be undertaken for punitive or psychological deterrent effect.

*Id.* at 7763 (footnotes omitted).

Although the household goods are of little value to creditors and are rarely seized, when seizure does occur the Commission found that it can have severe economic consequences for the consumer. The consumer, most likely already enmeshed in a financial crisis, loses the possession and use of household necessities such as furniture, appliances, linens and kitchenware. While the monetary gain realized by the creditor upon seizure and sale of goods is minimal to nonexistent, the replacement cost to the consumer is substantial, not to mention the sentimental value of the possessions and psychological impact of the loss on the consumer. "Thus seizure often imposes a cost on the consumer which is seriously disproportionate to any benefit the creditor obtains." *Id.*

The Commission further found that even in the absence of actual seizure, HHG security interests still resulted in injury to consumers. Creditors rely on HHG security interests primarily as a "psychological lever to seek payment and to persuade consumers to take other actions the creditors may deem appropriate...." *Id.* The Commission recognized that not all creditors use threats of seizure to coerce consumer response but concluded that "the preponderance of evidence supports a conclusion that such threats are commonplace." [19] *Id.* at 7764. Because the loss occasioned by the seizure of household goods is so profound, threats of seizure in

**19.** For example, the Commission found that some finance company training manuals contain instruction on psychological tactics such as "chase and recheck" whereby an office representative visits the consumer's home to "check" the security and arouse the consumer's anxiety. 49 Fed.Reg. at 7764. Ledger card entries in files of debtors were found to include directives to apply pressure to family members, such as "work HHG on wife," by threatening irreparable loss of intimate possessions. *Id.*

themselves are uniquely harmful and disruptive to the consumer and the family.[20] *Id.* The injury resulting from "threats" or "suggestions" of seizure is not limited to psychological harm. Consumers threatened with the loss of their most basic possessions become desperate and peculiarly vulnerable to any suggested "ways out." As a result, "creditors are in a prime position to urge debtors to take steps which may worsen their financial circumstances." *Id.* The consumer may default on other debts or agree to enter refinancing agreements which may reduce or defer monthly payments on a short-term basis but at the cost of increasing the consumer's total long-term debt obligation. Consumers may also forego assertion of valid defenses, setoffs or counterclaims in their haste to reach acceptable repayment agreements so as to avoid the perceived imminent seizure of their property. *Id.* at 7764–65. In sum, consumers at risk of losing their household necessities will take steps which substantially worsen their overall financial condition.

(b) *Wage assignments.* A wage assignment allows the creditor, upon filing with the debtor's employer, to receive all or a portion of the debtor's wages directly from the employer. Wage assignments, unlike wage garnishments, do not require a judgment and can be filed without any judicial review of the creditor's claim. The Commission found that wage assignments were used primarily by small loan and finance companies in California, Illinois, Michigan and New York. *Id.* at 7757. Although estimates varied, the Commission concluded that wage assignments are prevalent in states where they are permitted and are used in a significant number of consumer transactions. *Id.*

The Commission found wage assignments particularly harmful to consumers because they can be invoked without the due process safeguards of a hearing and opportunity to present defenses.[21] *Id.* Although some states provide debtors some statutory procedural protections allowing them to prevent effectuation of a wage assignment by serving a notice of defense on the employer and creditor, the Commission found such protective schemes generally ineffective, due to lack of awareness and understanding on the part of the debtor. "[D]espite the existence of state statutes, many wage assignments result in collection by creditors even when there have [sic] been a breach of warranty, fraud, or other violation of law that may constitute a defense to payment." *Id.* at 7758.

The rulemaking record further established that wage assignments injure consumers by detrimentally injecting the creditor into the employment relationship. Employers are hostile to wage assignments due to added administrative costs and burdens and the fear that the employee's job motivation and performance will suffer as a result of the reduction in wages. *Id.* Moreover, employers tend to view the consumer's failure to repay the debt as a sign of irresponsibility. As a consequence many lose their jobs after wage assignments are filed.[22] Even if the consumer retains the job, promotions, raises, and job assignments may be adversely affected. *Id.*

---

**20.** Specifically, the Commission found that "the threat to seize household possessions causes 'great emotional suffering, humiliation, anxiety, and deep feelings of guilt, and this distress can lead to physical breakdowns or illness, disruption of the family, and undue strain on family relationships.'" 49 Fed.Reg. at 7765 (quoting P.O. Report at 136, citing testimony from legal assistance attorney).

**21.** Whereas pre-judgment garnishment has been found to deprive the debtor of constitutional due process rights, *see Sniadach v. Family Finance Corp.,* 395 U.S. 337, 89 S.Ct. 1820, 23

L.Ed.2d 349 (1969), prejudgment wage assignments have survived constitutional challenge because they lack the requisite state action. *See, e.g., Bond v. Dentzer,* 494 F.2d 302 (2d Cir.), *cert. denied,* 419 U.S. 837, 95 S.Ct. 65, 42 L.Ed.2d 63 (1974).

**22.** The Commission noted that the Consumer Credit Protection Act, 15 U.S.C. § 1674(a), prohibits employers from firing employees whose wages have been garnished. The Act does not, however, apply to wage assignments.

Wage assignments are usually invoked at a time when the debtor is already experiencing severe financial hardship. Loss of a substantial portion of wages tends to cause further disruption of family finances and may even put at risk the wage earner's ability to provide necessities for the family. *Id.* at 7758–59. Even when wage assignments are not actually invoked, consumer injury may still result. As with HHG security interests, the Commission found that creditors use wage assignments as *in terrorem* devices to coerce consumers to pay. The invocation of a wage assignment or just simply the threat of invocation may lead a debtor to enter into costly refinancing, to improvidently default on other obligations, or to forego valid defenses. Thus consumers will act against their own best economic interests to avoid the greater potential injury of having creditors contact their employers and risk losing their jobs. "[C]reditors exploit that fear despite the fact that job loss would be economically counterproductive to the creditor." *Id.* at 7758.

The Commission, thus, concluded:

In the absence of procedural safeguards, the potential for severe, substantial disruption of employment, the pressure that results from threats to file wage assignments, and the disruption of family finances constitute significant consumer injury. State law is inconsistent and does not offer sufficient protection to prevent this consumer injury.

*Id.* at 7759.

■ The harms to consumers resulting from the use of HHG security interests and wage assignments identified by the Commission on the basis of the rulemaking record are neither trivial or speculative nor based merely on notions of subjective distress or offenses to taste. The use of HHG security interests and wage assignments result in or create a significant risk

of substantial economic and monetary harm to the consumer as well as potential deprivations of their legal rights. Hence the Commission clearly met its first criterion of establishing substantial consumer injury.

### 2. *Countervailing Benefits*

The Commission recognizes that most business practices entail a balancing of costs and benefits to the consumer. Therefore the Commission "will not find that a practice unfairly injures consumers unless it is injurious in its net effects." Policy Statement at 37. To make this cost-benefit determination, the Commission examines the potential costs that the proposed remedy would impose on the parties and society in general. In the present case, the Commission made the following assessment:

The potential costs of most significance in this proceeding include increased collection costs, increased screening costs, larger legal costs and increases in bad debt losses or reserves. Increased creditor costs generally would be reflected in higher interests to borrowers, reduced credit availability, or other restrictions such as increased collateral or down payment requirements.

49 Fed.Reg. at 7744 (footnotes omitted).

In weighing the costs and benefits of the Credit Practices Rule to consumers and the credit industry, the Commission first noted that the potential cost of eliminating HHG security interests and wage assignments is diminished by the presence of other remedies retained by creditors under the Rule. Creditor remedies unaffected by the Rule include the right to take purchase-money security interests which allow for repossession of the particular item purchased, to obtain a deficiency judgment or bring a suit directly on the debt, and to garnish the debtor's wages.[23] Thus, "[t]he remedies subject to the rule must be evaluated in

---

**23.** Unlike HHG security interests and wage assignments, these remaining remedies do not result in the immediate seizure, without legal process, of the debtor's household necessities or wages. Though debtors may find the threat of a lawsuit disturbing, the threatened consequences

are not immediate. The debtor has time to consider the options and to seek legal counsel. Moreover, the debtor's legitimate legal interests will presumably be protected through the legal process.

light of their more *incremental* contribution to deterring default or reducing other creditor costs given remedies that remain available." *Id.* at 7744–45 (emphasis added).

■ Of course, to the extent HHG security interests and wage assignments actually reduce creditor costs, consumers will theoretically benefit by the greater availability of credit at a lower cost. In short, the crucial issue before the Commission was whether prohibiting HHG security interests and wage assignments would decrease availability and increase the cost of credit to consumers and, if so, whether this cost was outweighed by the benefits of the Rule to the same consumers (the benefits being the avoidance of the harms incurred by consumers as a result of the use of HHG security interests and wage assignments). Based on record evidence, the Commission concluded that the Rule would have only a marginal impact on the cost or availability of credit, and that this marginal cost was clearly overshadowed by the much greater risks to consumers resulting from the use of HHG security interests and wage assignments. *See infra* pp. 985–988. Thus we find that the Commission satisfied the second prong of the three-part consumer injury test set out in its Policy Statement.

### 3. *Injury is Not Reasonably Avoidable*

The requirement that the injury cannot be reasonably avoided by the consumers stems from the Commission's general reliance on free and informed consumer choice as the best regulator of the market. "Normally we expect the marketplace to be self-correcting, and we rely on consumer choice—the ability of individual consumers to make their own private purchasing decisions without regulatory intervention—to govern the market." Policy Statement at 37. As long recognized, however, certain types of seller conduct or market imperfections may unjustifiably hinder consumers' free market decisions and prevent the forces of supply and demand from maximizing benefits and minimizing costs. In

such instances of market failure, the Commission may be required to take corrective action. Such corrective action is taken "not to second-guess the wisdom of particular consumer decisions, but rather to halt some form of seller behavior that unreasonably creates or takes advantage of an obstacle to the free exercise of consumer decisionmaking." *Id.* at 37.

The Commission found that the injuries occasioned by the use of HHG security interests and wage assignments are not reasonably avoidable by consumers for two interrelated reasons: (1) consumers are not, as a practical matter, able to shop and bargain over alternative remedial provisions; and (2) default is ordinarily the product of forces beyond a debtor's control. 49 Fed.Reg. at 7744. The Commission identified a confluence of factors which create "an obstacle to the free exercise of consumer decisionmaking" and which creditors are able to use to their advantage.

First, the Commission found that most creditors rely on standardized form contracts with boilerplate provisions defining the rights and duties of the parties. *Id.* at 7745–47. The Presiding Officer's Report concludes:

> Creditors universally make use of standardized forms in extending credit to consumers. These forms are prepared for creditors or obtained by them, and the completed contract is presented to the prospective borrower on a "take it or leave it" basis. The primary reason for this is simply that it is not feasible to conduct the transaction in any other way.

P.O. Report, J.A. at 395. The Commission acknowledges that standard form contracts are a business necessity for small-loan creditors. 49 Fed.Reg. at 7744. The Commission further found, however, that due to certain characteristics of the consumer credit market, it could not reasonably conclude that the mix of remedies included in the contracts reflects consumer preferences. *Id.* at 7744, 7746. Whereas consumers may bargain over terms such as interest rates, and the amount or number of payments, their ability and incentive to

bargain over the boilerplate remedial provisions is substantially limited. *Id.* at 7746–47.

Several aspects of the credit transaction combine to prevent consumers from making meaningful efforts to search, compare, and bargain over remedial provisions. As noted, standard form contracts are presented on a take it or leave it basis. While there are differences in the kinds of contracts offered by different creditors, certain creditors, namely finance companies serving higher-risk borrowers, are most likely to include HHG security interests and wage assignments. Furthermore while the incidence of use of these provisions may differ across different regions of the country, contracts offered by creditors of a given class in local areas are often substantially identical. *Id.* at 7746. Given the substantial similarity of contracts, consumers have little ability or incentive to shop for a better contract.

Consumers' ability to shop and bargain is further constricted by the fine print and technical language used in the contracts. *Id.* at 7747. Moreover, consumers are limited in their ability to seek explanations from lenders since inquiries about remedies are likely to make creditors wary and hesitant to grant a loan. Finally, "[i]n some cases, comparison is impossible because the creditor refuses to give out the loan contract until the borrower seems ready to sign it." *Id.*[24]

Consumers' limited ability and incentive to search out better contracts is compounded by creditors' lack of incentive to advertise or compete on the basis of remedies. *Id.* Consumers' lack of understanding of

contractual terms is the first obstacle. Before competing on the basis of exclusion or inclusion of particular contract terms, creditors would have to educate the consumer as to the ramifications of the inclusion of a particular clause and why a contract excluding the clause is preferable. Such an educational effort would entail substantial costs and would tend to create a free-rider problem with competing creditors reaping benefits from the advertising creditor's educational efforts. The second disincentive to creditors is the problem of adverse selection. If a creditor advertised less onerous remedies, the creditor is likely to attract a disproportionately greater share of those debtors who intend to or who are most likely to default.

The Commission also relied upon the fact that default is a relatively infrequent occurrence and generally not within consumers' control. *Id.* at 7747–48. Consumers could avoid the injuries attendant on the use of HHG security interests and wage assignments if they avoided defaulting on their payments. Relying principally on two large complementary survey studies[25] of the causes of default, the Commission concluded that default is ordinarily the product of forces beyond the debtor's control. Default is usually precipitated by unforeseeable and unavoidable events that reduce income (*e.g.,* job loss or pay reduction) or increase demands (*e.g.,* incapacitation, relocation, unplanned emergency expenses, marital separation or divorce). When these events, outside the debtor's immediate control, occur default is generally an involuntary response.[26] *Id.* at 7747. The unfore-

**24.** Contrary to the dissent's assertion, discussion of the use of standard form contracts and fine print is *not* "empty rhetoric" simply because no deception is involved or because the Commission found that additional information would not alter the consumer's choice. *See* Dissent at 993; *see also infra* pp. 978, 989. As the discussion in the text illustrates, the Commission relies on these attributes of the contracts as contributing factors in its overall analysis of the characteristics of the consumer credit market which limit consumers' incentive and ability to bargain over remedial provisions and creditors' ability to compete on the basis of such terms.

**25.** One study by the National Commission on Consumer Finance, *see* NCCF Technical Study, Vol. V. (1972), relied on survey data from creditors. The other study relied on survey data from debtors. *See* D. Caplovitz, Consumers in Trouble: A Study of Debtors in Default (1974). For a discussion of the results of the two studies, see Staff Report, J.A. at 786–802.

**26.** Petitioner AFSA argues that default is an infrequent occurrence and that not all debtors experiencing these adversities default, therefore, the debtors who default in such circumstances could avoid default through better planning and

seeable and unavoidable nature of default not only make the implementation of the creditor remedies unavoidable but also limit consumers' incentive to search for contracts which do not include particular remedies. Since consumers do not expect to default, the invocation of particular creditor remedies seems remote and speculative at the time of contracting and thus is not a material element in the consumer's decision. Instead consumers quite reasonably focus their attention on the more immediate terms such as interest rates and payments. *Id.* at 7746.

■ On the basis of the foregoing analysis, the Commission concluded that consumers cannot reasonably avoid the inclusion of HHG security interests and wage assignments in credit contracts or their implementation. We conclude that the Commission's finding of unavoidable injury comports with the criteria set out in the Commission's Policy Statement.

### D. *Challenge to the FTC's Exercise of Unfairness Authority Under Section 5(a)*

Although the Commission has identified a substantial consumer injury, which is not offset by countervailing benefits, and which cannot be reasonably avoided by consumers, petitioners nonetheless challenge the ban on HHG security interests and wage assignments as outside the scope of the Commission's unfairness authority. Petitioners claim that the FTC's description of what constitutes a substantial, unjustified, and unavoidable injury in this proceeding exceeds the bounds the Commission itself has previously erected for channeling its discretion to proscribe unfair practices. *See* AFSA Brief at 17. With respect to "injury," petitioners assert that section 5 does not encompass consumer harms re-

sulting from the consumer's own choice of action unless that choice is improperly manipulated by seller overreaching (*i.e.*, deception, coercion, or withholding of material information). Relatedly petitioners argue that the requirement of "unavoidability" is not met unless the seller's overreaching interferes with the consumer's ability to make an informed uncoerced choice. Finding no creditor overreaching in the present case, petitioners assert that the FTC is attempting to play "national nanny" by protecting consumers against the hardships of their own miscalculations in pledging HHG security interests and wage assignments. *See* AFSA Brief at 62. In petitioners' view the FTC is gratuitously intervening in the market to provide the optimal mix of options for consumers. This exceeds the FTC's authority, in petitioners' view, because the FTC must first identify some overreaching creditor or seller practice which is distorting the proper functioning of the market.

In essence, petitioners ask the court to limit the FTC's exercise of its unfairness authority to situations involving deception, coercion, or withholding of material information. As noted earlier, despite considerable controversy over the bounds of the FTC's authority, neither Congress nor the FTC has seen fit to delineate the specific "kinds" of practices which will be deemed unfair within the meaning of section 5. Instead the FTC has adhered to its established convention, envisioned by Congress, of developing and refining its unfair practice criteria on a progressive, incremental basis. Nevertheless, petitioners seek to support their claim that the FTC has exceeded its statutory authority by arguing that the Commission has never before asserted the scope of authority exercised in this rulemaking. Thus, in addressing petitioners' challenge, we look first to past

the taking of precautionary measures. AFSA Brief at 40–41. The Commission addressed this issue and concluded that while "[p]recautions can reduce the risk of default ... no reasonable level of precautions can eliminate the risk." 49 Fed.Reg. at 7748. Moreover, consumers have differential capacities to take precautions and default in any individual situation is likely to

depend on the mix of circumstances at that point in time (*e.g.*, the consumer's level of debt, the number and type of adverse events occurring at once, benefits available, amount of savings or other assets available, presence of support from other family members). *See* FTC Brief at 27. In light of these considerations, we find petitioners' argument unpersuasive.

Commission unfairness decisions to determine if a basis in precedent exists for the Commission's present rulemaking.

Our task of reviewing Commission unfairness precedent is hindered by the Commission's cautious use of its unfairness authority as an independent basis for decision—most frequently the Commission has relied on alternate theories of deception and unfairness. *See supra* note 15. The Credit Practices Rule is a rare example of the Commission proceeding solely on unfairness grounds. We are aided, initially, by a fairly recent article authored by a member of the Commission's Office of

Planning cataloguing the "kinds" of commercial practices which the Commission has determined to be unfair. Specifically this article identifies four primary categories of practices which have been prohibited as unfair: (1) withholding material information; (2) making unsubstantiated advertising claims; (3) using high-pressure sales techniques; and (4) depriving consumers of various post-purchase remedies. *See* Craswell, *supra* note 15, at 109.

 It is true that many, *but not all,* of the Commission's unfairness decisions have involved the kind of overreaching seller conduct pinpointed by petitioners.[27] But of

---

**27.** "Sometimes consumer unfairness is found even without coercion or denials of product information. A striking example arose in the early 1970's when a company began promoting razor blades in a way that risked serious injury to small children. Free samples of the blades were included indiscriminately in advertising supplements to home-delivered newspapers.... The Commission was able to use its unfairness jurisdiction to negotiate a consent decree barring this unsafe marketing technique [, *see* Philip Morris, Inc., 82 F.T.C. 16 (1973) ]." Companion Statement on the Commission's Consumer Unfair Jurisdiction (accompanying 1980 Policy Statement), *reprinted in* H.R.Rep. No. 156, Pt. 1, 98th Cong., 1st Sess. 41, 42 (1983); *see also R.F. Keppel & Bro.,* 291 U.S. 304, 54 S.Ct. 423, 78 L.Ed. 814 (unfair practice to use gambling____ a lottery marketing technique ____ to sell candy, *see* discussion *supra* p. 966.

We note, moreover, that there is no bright line definition of what constitutes a coercive practice. Coercive seller practices deemed unfair have generally involved situations where the seller's conduct prevents the consumer from making a free, informed choice. *See Arthur Murray Studio, Inc. v. FTC,* 458 F.2d 622 (5th Cir.1972) (unfair for dance studio to use "cajolery" and other high pressure techniques aimed at enticing elderly women to enter contracts for extended series of dance lessons costing thousands of dollars); *Holland Furnace Co. v. FTC,* 295 F.2d 302 (7th Cir.1961) (unfair for salesman to dismantle home furnaces for cleaning and inspection and then refuse to reassemble them until customer agreed to buy additional parts and services); *see also* Cooling-Off Period for Door-to-Door Sales, 16 C.F.R. pt. 429 (1984) (providing for 3-day cooling-off period during which consumer can cancel a contract entered with a door-to-door salesperson). The present case may arguably entail an element of coercion. . Consumers in serious financial need of a loan are presented with contracts containing HHG security interests and wage assignments on a "take it or leave it" basis with no apparent

alternatives available. *Cf. infra* p. 983 (discussing FTC's opinion that the use of HHG security interests has many of the attributes of economic duress).

Furthermore, petitioners overlook critical aspects of unfairness decisions purportedly involving seller overreaching, which undercut their basic premises. For example, the petitioners assert that there is no precedent for the Commission to intervene in the market to produce a better mix of options in the absence of some identified seller practice which is distorting the proper functioning of the market. However, with respect to finding the withholding of material information or unsubstantiation of advertising claims unfair one might ask why in the absence of deception, should not the market be allowed to determine the optimal level of information? Yet the Commission has on a number of occasions promulgated rules requiring sellers to disclose "essential" information. *See, e.g.,* Care Labeling of Textile Wearing Apparel, 16 C.F.R. pt. 423 (1984) (requiring clothes to include labels giving washing instructions); Labeling and Advertising of Home Insulation, 16 C.F.R. pt. 460 (1984) (requiring disclosure of the R-value of insulation); Octane Posting and Certification, 16 C.F.R. pt. 306 (1984) (requiring posting of octane levels). Petitioners' argument fails to distinguish between unfair practices and deceptive practices. A comparative review of various types of unfairness cases is complicated by the fact that most were brought on a deception theory and found to be deceptive as well as unfair. Hence the distinction between the deception rationale and the unfairness rationale tends to become obfuscated. Nonetheless the two rationales are distinct: A practice is deceptive when the consumer is forced to bear a larger risk than expected (*e.g.,* the consumer is misled) whereas a practice is unfair when the consumer is forced to bear a larger risk than an efficient market would require. *See generally* Craswell, *supra* note 15, at 125. The substantiation of advertising claim cases are illustrative.

particular relevance to this case are those Commission decisions dealing with the allocation of post-purchase rights. The majority of consumer transactions involve not only the purchase of a product but also the allocation, between the buyer and seller, of a number of contractual and noncontractual rights and duties with respect to the product purchased (*e.g.*, remedies available to the buyer if the product is defective or to the seller if the buyer defaults). The Commission, in the post-purchase right cases, has stepped in to correct allocations of post-purchase remedies determined to be unfair to consumers.

■ A prime example is the Commission's rule preventing sellers from taking advantage of the holder-in-due-course doctrine. *See* Preservation of Consumers' Claims and Defenses, Statement of Basis and Purpose, 40 Fed.Reg. 53,506 (1975) (codified at 16 C.F.R. pt. 433 (1984)). The holder-in-due-course doctrine immunizes the subsequent holder of a negotiable instrument from the claims or defenses which the consumer could have asserted against the original holder, if the subsequent holder took the instrument for value, in good faith, and without notice of any claims or defenses against it. Thus, under the holder-in-due-course doctrine, the seller could discount the consumer's note to a third party making the consumer unconditionally liable to the third party with no recourse even if the product turned out to be totally defective. The Commission determined that the use of the holder-in-due-course doctrine in consumer credit transactions was an unfair practice. *See id.* at 53,524 ("[I]t constitutes an unfair and deceptive practice to use contractual boiler-plate to separate a buyer's duty to pay from a seller's duty to perform."). The Holder-in-Due-Course Rule abrogated the use of the holder-in-due-course doctrine in consumer credit transactions by requiring sellers to include a notice in all consumer sales instruments stating that any subsequent holder is subject to all claims and defenses that could be asserted against the seller.

Petitioners distinguish the Holder-in-Due-Course Rule, by asserting that there the Commission intervened "to prevent consumers from being victimized by a counterintuitive legal doctrine." AFSA Brief at 31 n. 3. Petitioners thus attempt to characterize the rationale underlying the Holder-in-Due-Course Rule solely in terms of deception. We find this argument unpersuasive in light of the Commission's stated rationale. Prior to promulgating the Holder-in-Due-Course Rule, the Commission had already held a seller's practice of routinely assigning purchasers' notes to third parties inherently unfair and deceptive because consumers were unaware and did not intuitively expect that a seller could deprive them of valid claims and defenses to the obligation by discounting their notes to third parties. Disclosure was determined to be the proper remedy. *See In re All-State Industries, Inc.*, 75 F.T.C. 465, 489–94 (1969), *aff'd* 423 F.2d 423 (4th Cir.), *cert. denied*, 400 U.S. 828, 91 S.Ct. 57, 27 L.Ed.2d 58 (1970). The Commission, however, adopted a more economically oriented rationale focusing on the effect of the seller's post-purchase conduct on the consumer's economic welfare when it later adopted the Holder-in-Due-Course Rule which com-

The FTC has determined that advertisers must have a "reasonableness basis" for making a claim and that making unsubstantiated advertising claims may be both an unfair and a deceptive practice. Unsubstantiated claims are unfair because consumers are forced to bear the risk that the claim will turn out to be false (and verification of the claim by the consumer would generally entail disproportionate costs to verification by the advertiser); unsubstantiated claims are deceptive because consumers expect that the advertiser has some basis for making the claim. *See, e.g. In re Pfizer, Inc.,* 81 F.T.C.

23, 58–65 (1972); *In re Firestone Tire & Rubber Co.,* 81 F.T.C. 398, 451 (1972), *aff'd,* 481 F.2d 246 (6th Cir.), *cert. denied,* 414 U.S. 1112, 94 S.Ct. 841, 38 L.Ed.2d 739 (1973). *See also In re Porter & Dietsch, Inc.,* 90 F.T.C. 770, 866 & n. 11 (1977) (the "reasonable basis" standard for evaluating the substantiating material is the same whether advertisement is analyzed under a theory of deception or a theory of unfairness), *aff'd in relevant part,* 605 F.2d 294 (7th Cir.1979), *cert. denied,* 445 U.S. 950, 100 S.Ct. 1597, 63 L.Ed.2d 784 (1980); *In re National Dynamics Corp.,* 82 F.T.C. 488, 550 n. 10 (1973) (same).

pletely prevented sellers from taking advantage of the holder-in-due course doctrine. *See* Preservation of Consumers' Claims and Defenses, Statement of Basis and Purpose, 40 Fed.Reg. at 53,522–24.

The Commission believes that relief under Section five of the FTC Act is appropriate where sellers or creditors impose adhesive contracts upon consumers, where such contracts contain terms which injure consumers, and where consumer injury is not off-set by a reasonable measure of value received in return. In this connection, the Commission's authority to examine and prohibit unfair practices in or affecting commerce in the manner of a commercial equity court is appropriately applied to this problem. Where one party to a transaction enjoys substantial advantages with respect to the consumers with whom he deals, it is appropriate for the Commission to conduct an inquiry to determine whether the dominant party is using an overabundance of market power, or commercial advantage, in an inequitable manner.

*Id.* at 53,524.

Thus the Commission in promulgating the Holder-in-Due-Course Rule articulated an economic rationale for its unfairness determination.

This theory (in effect) posits a market imperfection which for some reason prevents the market from arriving at the most efficient distribution of post-purchase rights between buyers and sellers. Faced with such an imperfection, the Commission steps in to correct the market's results by reassigning post-purchase rights between the various parties until the most efficient result is reached.

Craswell, *supra* note 15, at 131. This is basically the same economic rationale exemplified in the Commission's Policy Statement and utilized in this case. *See* Policy Statement at 37 (Commission's actions are brought "to halt some form of seller behavior that unreasonably *creates* or *takes advantage* of an obstacle to the free exercise of consumer decisionmaking") (emphasis added). Thus contrary to petitioners' assertions, the Commission has in the past sanctioned intervention not only where the seller's conduct affirmatively causes distortion of proper market functioning but also where the seller takes advantage of an existing obstacle which prevents free consumer choice from effectuating a self-correcting market.

In the present case, the Commission identified particular aspects of the credit transaction which substantially limit the consumer's ability and incentive to bargain over credit remedies and which limit the creditor's incentives to compete on the basis of remedies. *See supra* pp. 976–978. This market imperfection prevents consumer choice from operating to effect the mix of remedies which most reflects consumer preferences and leaves creditors free to exploit this market failure by including an entire litany of remedies as boilerplate provisions.[28] Thus the Commission concluded

---

**28.** In the present case the contract terms in question are buried in fine print and only become operative upon the contingency of default. Analogously the Holder-in-Due-Course Rule involved an aspect of contract law which did not appear on the face of the contract and which only became relevant if the seller discounted the note to a third party. In other cases, the Commission has found an unfair practice where the contract did not prevent the seller from engaging in particular conduct. *See, e.g., In re Spiegel, Inc.*, 86 F.T.C. 425 (1975) (unfair practice for Spiegel to bring lawsuits against out-of-state mail order customers in Cook County, Illinois), *aff'd in relevant part*, 540 F.2d 287 (7th Cir. 1976); *In re Beneficial Finance Corp.*, 86 F.T.C. 119 (1975) (unfair practice for tax preparation firm to use confidential tax information about customers for commercial purposes without first obtaining a signed consent), *aff'd in relevant part*, 542 F.2d 611 (3d Cir.1976), *cert. denied*, 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977).

The Commission has also on occasion required the inclusion of specific, substantive, non-informational terms in consumer contracts. *See* Use of Negative Option Plans by Sellers in Commerce, 16 C.F.R. pt. 425 (1984) (setting time limits within which sellers must ship merchandise and consumers must be allowed to return merchandise as well as requiring disclosure of how consumers can avoid acceptance of goods and whether billing charges include postage). Somewhat analogously the Commission's rule requiring that consumers be given a three day cooling-off period following a purchase from a

that by insisting on HHG security interests and wage assignments, creditors are taking advantage of an existing obstacle to the free exercise of consumer decisionmaking and thereby engaging in an unfair practice.

■■■■ While we agree with petitioners that the Commission cannot be allowed to intervene at will whenever it believes the market is not producing the "best deal" for consumers, we nonetheless believe that this court would be overstepping its authority if we were to mandate, as petitioners urge, that the Commission's unfairness authority is limited solely to the regulation of conduct involving deception, coercion or the withholding of material information. As previously discussed, the Commission's consumer injury test, set forth in its Policy Statement, while not specifically defining the "kinds" of practices or injuries encompassed, is the most precise definition of unfairness articulated to date by either the Commission or Congress. Upon reviewing it, Congress has not seen fit to enact any more particularized definition of unfairness to limit the Commission's discretion. Indeed, the most significant congressional response to the Policy Statement has not been criticisms or rejection, but proposals to enact the Commission's three-part consumer injury standard into law. *See supra* pp. 970–971 & n. 14. Thus, the Commission has, for all practical purposes, been left to develop its unfairness doctrine on an incremental, evolutionary basis. *See supra*

p. 967. At this juncture, it is not for this court to step in and confine, by judicial fiat, the Commission's unfairness authority to acts or practices found to be deceptive or coercive. Our role is simply to review the Commission's exercise of its unfairness authority in this case. *See supra* pp. 968–969. We find that the Commission's articulated rationale for its determination that the taking of HHG security interests and wage assignments constitute unfair practices fully comports with the criteria set out in the FTC's Policy Statement. The Commission has sufficiently identified and documented the factors resulting in an obstacle to free consumer decisionmaking which is being exploited by creditors to the detriment of consumers.[29] We cannot therefore say that the Commission has exceeded the boundaries of its statutory authority to define unfair practices in this case.

The Commission's economic rationale for finding the taking of HHG security interests and wage assignments to be unfair practices is additionally bolstered by considerations of equity and public policy. It is well established that certain types of contracts or contractual provisions may be prohibited simply because they violate accepted principles of fair play and equity, *e.g.*, contracts of adhesion. *Cf.* U.C.C. § 2–302 (1978) (unconscionable contracts or clauses). And courts have recognized that

door-to-door salesman mandates that an additional substantive term be included in the agreement. *See* Cooling-Off Period for Door-to-Door Sales, 16 C.F.R. pt. 429 (1984).

**29.** The dissent claims that the Commission cannot intervene "when it does not know the 'obstacle to free choice.'" *See* Dissent at 994. As the foregoing discussion illustrates, however, this is not a case where the Commission failed to articulate and document the factors resulting in an obstacle to free consumer choice. The dissent simply chooses to disregard the Commission's comprehensive analysis of the confluence of factors which create an obstacle to free consumer choice and a self-correcting market. Instead, the dissent places principal reliance on the fact that HHG security interests and wage assignments are used primarily by finance companies dealing with lower-income, higher risk borrowers, whereas higher-income, creditwor-

thy consumers may obtain credit without these onerous provisions. Thus while the dissent acknowledges that an obstacle to the free exercise of consumer decision-making does exist for the lower-income, higher-risk consumer, it finds this justified by the higher risk level of these borrowers and consequently not evidence of a market failure. But the fact that the Commission's analysis applies predominantly to certain creditors dealing with a certain class of consumers (lower-income, higher-risk borrowers) does not, as the dissent suggests, undercut its validity. The Commission has identified a market failure with respect to a particular category of credit transactions which is being exploited by the creditors involved to the detriment of the consumers involved, and thus the dissent's argument that higher-income, more creditworthy consumers can obtain credit on better terms from banks is unavailing.

the Commission was never intended to disregard principles of equity in reaching its decisions. *See Sperry & Hutchinson*, 405 U.S. at 244, 92 S.Ct. at 905 (FTC may "like a court of equity" consider "public values beyond those enshrined in the letter or ... spirit of the antitrust laws"); *FTC v. Standard Educ. Soc'y*, 86 F.2d 692, 696 (2d Cir.1936) (Hand, J.) (FTC's "duty in part at any rate, is to discover and make explicit those unexpressed standards of fair dealing which the conscience of the community may progressively develop"), *rev'd on other grounds*, 302 U.S. 112, 58 S.Ct. 113, 82 L.Ed. 141 (1937) (reversing that part of Second Circuit's holding which modified and weakened FTC's cease and desist order); *see also Spiegel, Inc. v. FTC*, 540 F.2d 287, 292 (7th Cir.1976) (invoking a public policy rationale and stating that FTC has "authority to prohibit conduct that, although legally proper, [is] unfair to the public"). In its Policy Statement, the Commission states that considerations of public policy are frequently used as confirmatory evidence of the unfairness of a particular practice but that "[s]ometimes public policy will independently support a Commission action." Policy Statement at 38–39. *See generally* Averitt, *supra* note 15, at 275–78 (discussing FTC's reliance on public policy considerations); Craswell, *supra* note 15, at 135–39 (discussing FTC's reliance on considerations of equity).

■ In the present case, the Commission found that wage assignments are prohibited in Uniform Credit Code states, several other states, and the District of Columbia. 49 Fed.Reg. at 7756. The substantial majority of states permitting wage assignments impose restrictions on their use. *Id.* Similarly, several states prohibit the taking of non-possessory, non-purchase security interests in household goods, and others place limitations on their use. *Id.* at 7781–82 & n. 10. Both the NCCF study and the Creditor Remedies Project, which provided the impetus for the Commission's rulemaking, *see supra* pp. 961–962, delineated the creditor abuses and concomitant consumer injuries entailed in the use of HHG security interests and wage assignments,

and recommended that the use of these creditor remedies be substantially restricted or eliminated. In addition, the Commission stated its opinion that:

> [T]he use of blanket security interests to exhort an overextended or unemployed consumer to make a decision which may lead to increased financial difficulties has many of the attributes of economic duress. Threats to seize the personal possessions of a consumer and his or her family clearly meet many of the criteria for economic duress, especially given the dire financial circumstances in which the consumer finds himself. Although the Commission has premised its findings regarding the unfairness of threats to seize household goods on the resulting psychological and economic injury to consumers, as demonstrated by information contained in the rulemaking record, these *common law doctrines provide evidence of public policy supporting the Commission's findings.*

49 Fed.Reg. at 7765 (footnotes omitted). Thus the Commission's exercise of its unfairness authority in proscribing the use of HHG security interests and wage assignments can be fairly viewed as falling within the Commission's authority to take into consideration principles of equity and public policy and to proscribe acts or practices found to violate those principles.

### E. Challenge to FTC's Rulemaking Authority Under Section 18(a)

■ Section 18(a)(1)(B) of the FTC Act empowers the Commission to prescribe "rules which define with specificity acts or practices which are unfair or deceptive acts or practices" and to "include requirements prescribed for the purpose of preventing such acts or practices." Petitioners claim that by branding the very taking of a security interest in household goods or an assignment of future wages as unfair practices, the FTC has not defined with specificity any unfair practice but has merely prescribed a requirement for preventing unfair practices. *See* AFSA Brief at 55. The petitioners' argument is predicated on the

Second Circuit's holding in *Katharine Gibbs School (Inc.) v. FTC*, 612 F.2d 658 (2d Cir.1979). In *Katharine Gibbs*, the Second Circuit set aside the Commission's "Vocational Schools Rule" because "[i]nstead of defining with specificity those acts or practices which it found to be unfair or deceptive, the Commission contented itself with treating violations of its 'requirements prescribed for the purpose of preventing' unfair practices as themselves the unfair practices." *Id.* at 662. The court held that the rule must define specific unfair practices; the unfair practices cannot be defined in terms of future violations of the rule's remedial requirements. Even if this court were to adopt the Second Circuit's view of section 18(a) expressed in *Katharine Gibbs*, we would still find it inapplicable to the present case.[30]

In promulgating the Vocational Schools Rule at issue in *Katharine Gibbs*, the FTC was concerned about "unfair and deceptive advertising, sales, and enrollment practices engaged in by some of the schools." *Id.* at 661. However, rather than defining the specific advertising, sales, and enrollment practices deemed unfair, the FTC adopted a rule regulating tuition refund policies. The rationale behind the rule was to alter the incentive structure for obtaining enrollments by making it financially burdensome for a school to accept any student who was unlikely to complete the course for any reason. *Id.* at 663. "Although the Commission did not fault existing refund policies, it provided, nonetheless, that any failure to comply with its newly prescribed refund obligations would constitute an unfair or deceptive act or practice in connec-

tion with the sale or promotion of a course." *Id.* The FTC's rule, thus, penalized every vocational school for every dropout regardless of cause, leading the Second Circuit to conclude that there was no rational connection between the prescribed, universally applicable refund provisions and the prevention of specific unfair enrollment practices.[31]

The provisions of the Credit Practices Rule at issue in this case are clearly distinguishable from the provisions of the Vocational Schools Rule set aside in *Katharine Gibbs*. The prescribed refund requirements of the Vocational Schools Rule were designed to prevent unrelated, unspecified unfair enrollment advertising and sales practices. In contrast, the Credit Practices Rule identifies specific practices, namely the taking of HHG security interests and wage assignments as collateral, as *per se* unfair and prohibits those practices.[32] *See* 49 Fed.Reg. at 7745 ("The rule defines the use of such clauses or procedures, *in se*, to be an unfair practice."). We agree with the Commission that "[b]ecause ... the direct relationship between the unfair practice and the proscription of that practice is apparent on the face of each ... provision, there is no reason to set out the two separately." *Id.* The Commission having defined with specificity the acts or practices deemed unfair has fully complied with the statutory requirements of section 18(a)(1)(B).

### III. SUBSTANTIAL EVIDENCE AND BREADTH OF REMEDY

Petitioners contend that even if the Credit Practices Rule's ban on HHG security

---

**30.** We note that *Katharine Gibbs* was the first case to decide the lawfulness of a rule promulgated under section 18 and the decision was not without controversy. *See Katharine Gibbs*, 612 F.2d at 671–76 (Newman, J., dissenting); *Katharine Gibbs School (Inc.) v. FTC*, 628 F.2d 755 (2d Cir.1980) (Oakes, J., dissenting from denial of petition for rehearing en banc) (joined by Mansfield, J. and Newman, J.).

**31.** The petitioners also rely on *Katharine Gibbs* to support their argument that the ban on the use of HHG security interests and wage assignments as collateral is an overly broad remedy lacking a rational connection to the practices

deemed unfair. This argument is addressed *infra* at Part III–C.

**32.** Petitioner AFSA, in its Reply Brief, argues that the FTC is attempting to circumvent the requirements set out in *Katharine Gibbs* by characterizing the Rule as a restriction on creditor remedies whereas really the Rule is a restriction on consumers' ability to give collateral. We find this semantic quibbling unpersuasive. The FTC has identified particular contractual creditor remedies, however characterized, as unfair practices and thus prohibited their use.

interests and wage assignments represents a permissible application of the three-part consumer injury standard within the Commission's statutory authority, the challenged provisions must still be set aside as arbitrary and capricious agency action. Petitioners argue that the Commission's conclusions are not supported by substantial evidence in the record and that the prohibition is an overly broad means of preventing the consumer injuries identified.

### A. Scope of Judicial Review

■■■■■ This court may set aside the Commission's action only if it "is not supported by substantial evidence in the rulemaking record," see 15 U.S.C. § 57a(e)(3),[33] or if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...." *Id.* (incorporating 5 U.S.C. § 706(2)(A) standard). The legislative history of the Magnuson-Moss Act further provides that the substantial evidence standard is to be applied only to the Commission's "factual determinations"; the arbitrary or capricious standard is to be applied to all other determinations. *See American Optometric Ass'n*, 626 F.2d at 904 (setting forth scope of judicial review under FTC Act of a trade regulation rule). A factual finding is supported by substantial evidence if the record contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *American Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 522, 101 S.Ct. 2478, 2497, 69 L.Ed.2d 185 (1981) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951)). To decide whether an agency's action is arbitrary or capricious, "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). "This 'arbitrary and capricious' standard of review is a highly deferential one, which presumes the agency's actions to be valid." *Environmental Defense Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C.Cir.1981) (citations omitted). Contrary to the dissent's approach, this standard "forbids the court's substituting its judgment for that of the agency, and requires affirmance if a rational basis exists for the agency's decision." *Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C. Cir.) (en banc) (citations omitted), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976).

### B. Substantial Evidence

The Credit Practices Rule, as previously discussed, was adopted after a nine-year rulemaking period in which an extensive record was developed and each provision of the Rule painstakingly considered. *See supra* pp. 962–964 & nn. 2–4. The Commission has presented detailed documentation of the record evidence relied upon to support each of its conclusions. *See* 49 Fed.Reg. 7745–48, 7755–68. The Commission's documentation is amply sufficient and we find no need to duplicate or supplement that documentation with our own recitation of the record evidence supporting each of the Commission's findings and conclusions.[34] Thus we address only the principal challenges to the sufficiency of the evidence raised by petitioners.

■■■■ First, petitioner AFSA questions the sufficiency and reliability of the "anec-

---

**33.** The statement of basis and purpose for a rule is defined in the statute as part of the "rulemaking record" which is subject to judicial review, *see* 15 U.S.C. § 57a(e)(1)(B), yet 15 U.S.C. § 57a(e)(5)(C) states that the contents and adequacy of the statement of basis and purpose "shall not be subject to judicial review in any respect." This court resolved this statutory anomaly in *American Optometric Ass'n*, 626 F.2d at 906, by stating that the court will consult the statement of basis and purpose where it is "helpful in understanding the Commission's reasoning, but, nevertheless, being careful not to impose upon the statement the unreasonable demands about which Congress was concerned [*i.e.*, requiring voluminous and detailed statements]." *Id.*

**34.** The court has already cited to various portions of the record evidence in Part II–C discussing the Commission's application of its three-part consumer injury standard.

dotal" evidence supplied by legal aid attorneys or consumer legal specialists who attested to the consumer injuries resulting from the use of HHG security interests and wage assignments. *See* AFSA Brief at 52–55. Specifically AFSA relies on "reservations" about the attorneys' testimony expressed by the Presiding Officer. *See* AFSA Brief at 53 n. 2. AFSA, however, disregards the Presiding Officer's final conclusion:

> [The attorneys] testimony was truthful and provided credible evidence of the injuries suffered by their clients in the consumer credit marketplace. Indeed, it would be difficult to identify a better source for such evidence.

P.O. Report, Appendix at 687. Furthermore, as the FTC points out, it relied on not only a large number of "anecdotes" from consumer law specialists, but also on other corroborating studies and materials. *See* FTC Brief at 24 n. 17; *see also supra* note 19.

Petitioners also contend that the record does not support the Commission's conclusion that the injuries entailed in the use of HHG security interests and wage assignments outweigh any benefits the availability of such clauses may provide consumers. Specifically, petitioners argue that the FTC did not find, and could not find on the basis of the record evidence, that the proscription on the use of household goods and wage assignments would not diminish the availability of credit or increase its cost for those consumers whose access previously depended on their ability to pledge household goods and wage assignments as collateral. *See* AFSA Brief at 42. Petitioners fault the Commission for accepting the conclusions of the rulemaking staff that the Rule would only marginally affect the cost and availability of credit over the contrary views of the FTC's Bureau of Economics and Bureau of Consumer Protection. *See* AFSA Brief at 47. In sum, petitioners claim that the Commission's cost-benefit

approach was inadequate and that this inadequacy had been brought to the Commission's attention by two of its own bureaus.[35]

Petitioners' argument harbors a fundamental misconception about the nature of the Commission's required cost-benefit analysis. Petitioners would require that the Commission's predictions or conclusions be based on a rigorous, quantitative economic analysis. There is, however, no basis for imposing such a requirement.

In its 1982 Policy Letter, the Commission stated its view of the required cost-benefit analysis:

> As to the element pertaining to the weighing of benefits and costs, however, the Commission believes there is an associated problem to consider, namely the risk that the analysis might unnecessarily complicate and delay an investigation or an ultimate litigation. For this reason, the Commission believes that a highly quantitative benefit/cost analysis may not be appropriate in each and every individual case, and that in some cases a far more subjective analysis would be the reasonable approach.

1982 Policy Letter, *supra* note 18, at 33.

Analogously the Magnuson-Moss Act, establishing the Commission's rulemaking authority, requires the Commission to include a statement of a rule's economic impact in the statement of basis and purpose. 15 U.S.C. 57a(d)(1). Congress, however, explicitly expressed its intent that this requirement not place excessively strict burdens on the Commission.

> In particular, the requirement that the statement include statements as to the economic impact of the rule does not require the Commission to undertake a full scale economic investigation prior to promulgation of the rule. To do this would inordinately delay FTC proceedings and deny relief to the consuming public while indefinite questions of economic prediction were resolved by the

---

**35.** Petitioners also cite the Presiding Officer's observation that the ban on the use of HHG security interests may have "far-reaching" effects. The flaw in this argument is addressed *infra* p. 988.

Commission. This provision should be read to require that the Commission consider the economic impact of the rule to issues and summarize its best estimate of that impact in the statement. Obviously, a full evaluation of the economic impact of the rule would have to await its implementation.

H.R.Rep. No. 1107, 93d Cong., 2d Sess. 47 (1974), U.S.Code Cong. & Admin.News 1974, p. 7729.

In addition to rejecting petitioners' view of the standard to which the Commission's cost-benefit analysis should be held, we also find petitioners' specific contentions of error unpersuasive. Most of petitioners' cost estimates are based on their own self-serving predictions that finance companies will restrict the availability and increase the cost of credit as a result of the Commission's Rule. Memoranda from the FTC's Bureaus of Economics and Consumer Protection form the primary basis of support in the record for petitioners' arguments. *See* Bureau of Economics Final Recommendations, *supra* note 3; *see also* Muris Memorandum, Higgins Memorandum, and Gramm Memorandum, *supra* note 3.

**36.** The econometric evidence in the record consisted of empirical studies examining the relationship between various restrictions on creditor remedies and the cost and availability of credit by analyzing data from states which already have laws restricting various creditor remedies.

**37.** The Bureau of Economics identified the three key functions of collateral as: compensation of creditors upon default; deterrence of default; and signalling. The Bureaus and petitioners assert that the Commission has overlooked the value of HHG security interests and wage assignments with respect to these functions. The Keller Memorandum, however, argues that evidence from other sources in the record refutes the theoretical bases of these arguments, *i.e.,* if default is involuntary then the theory of deterrence value is undercut; and if household goods have no resale value or a defaulter is fired when a wage assignment is exercised then the theory of compensation value is undercut. *See* Keller Memorandum, J.A. at 1934–35, 1949–51. With respect to signalling, whereby a debtor indicates the intention to repay by submitting to onerous creditor remedies in case of default, the Keller Memorandum

The Bureau of Economics and Consumer Protection focus their criticism on the rulemaking staff's interpretation of the econometric evidence in the record.[36] However, the econometric evidence in the record, by all accounts, contains deficiencies which prevent definitive answers. Thus it boils down to an issue of interpretation. The Division of Credit Practices put forth a strong argument supporting the staff's analysis and countering the interpretation proffered by the two Bureaus. *See* Memorandum to Commission from Christopher Keller, et al. (May 24, 1983), J.A. at 1933 [hereinafter cited as Keller Memorandum].

The Keller Memorandum points out that the Bureaus' counter-arguments are based primarily on abstract or on theoretical arguments about the operation of credit markets and the nature of consumer debtors which have little or no factual support in the record.[37] Keller Memorandum, J.A. at 1933. The Keller Memorandum also notes the Bureaus' exclusive focus on costs to the exclusion of the Rule's benefits which are both pecuniary and non-pecuniary.[38] The non-pecuniary nature of many of the benefits makes them difficult to measure and weigh in cost-benefit terms. Keller Memorandum, J.A. at 1939–41.

points out that there is no empirical evidence in the record to support the validity of signalling theory. J.A. at 1937–38. The Bureau of Consumer Protection expressly states that signalling theory is new and not well established or researched with respect to its validity in consumer credit markets. *See* Muris Memorandum, *supra* note 3, J.A. at 1835.

**38.** The pecuniary benefits cited include: fewer costly refinancings; fewer deficiency balances and in lower amounts; less loss of equity in property; goods remaining in the hands of the party where they have the most value; and fewer delinquencies triggered by one creditor filing a wage assignment. The non-pecuniary benefits cited include: procedural due process protections; the opportunity to assert valid claims and defenses; less economic distress and disruption of family finances; less embarrassment, humiliation, and anxiety; less interference in employment relations; retention of personal and household goods; and protection against coerced settlements. *See* Keller Memorandum, J.A. at 1940.

 On the basis of the record before us, we cannot say that the Commission's decision to reject the Bureaus' interpretations of the record evidence was unreasonable. Nor do we find the dissent's reassessment of the costs and benefits entailed by proscribing the use of HHG security interests and wage assignments persuasive. The dissent basically concludes, upon its own interpretation of the record, that the Commission "grossly exaggerates the beneficial impact of the Rule," *see* Dissent at 996, and underestimates the costs by failing to determine in absolute terms the number of consumers who will be denied credit as a result of the Rule. However, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). In our view, as indicated in our discussion of the nature of the cost-benefit analysis required of the Commission and the Commission's specific analysis in this rulemaking, *see supra* pp. 985–988 & nn. 35–38, the conclusions reached by the Commission with respect to the relative costs and benefits of proscribing the use of HHG security interests and wage assignments are supported by substantial evidence in the rulemaking record. *See National Ass'n of Regulatory Util. Comm'rs v. FCC,* 737 F.2d 1095, 1140 (D.C.Cir.1984) ("The fact that an agency's decision ... rests on a set of evidentiary facts less desirable or complete than one which would exist in some regulatory utopia does not alter our role.").

## C. *Breadth of Remedy*

 Petitioners claim that the challenged provisions of the Credit Practices Rule sweep too broadly and that the Commission could have chosen alternate means more narrowly tailored to preventing the specific abuses identified.[39] Our review of the Commission's chosen remedy is quite limited.

The Commission is the expert body to determine what remedy is necessary to eliminate the unfair or deceptive trade practices which have been disclosed. It has wide latitude for judgment and the courts will not interfere except where the remedy selected has no reasonable relation to the unlawful practices found to exist.

*Jacob Siegel Co. v. FTC,* 327 U.S. 608, 612–13, 66 S.Ct. 758, 760–761, 90 L.Ed. 888 (1946). We find no abuse of discretion and no cause to interfere in the present case. The Commission reasonably concluded that the most effective way to eliminate the unfair practices of taking HHG security interests and wage assignments was to proscribe their use.

The Commission considered narrower, alternative remedies but determined that such alternatives failed to address the full range of problems found inherent in the use of HHG security interests and wage assignments. For example, the Commission rejected a suggested alternative provision requiring only that creditors disclose in plain English the meaning of the contractual remedies. The Commission reasoned:

[D]isclosure alternatives would deal only partially with limited seller incentives to promote alternative remedies ... and would not address at all consumers' limited incentives to search for information about remedies.

49 Fed.Reg. at 7747. *See id.* at 7787–89 (discussing empirical evidence on the costs and benefits of the disclosure alternative).

Petitioner AFSA apparently seeks to bolster its overbreadth argument (and its cost-benefit argument) by citing to the Presid-

---

**39.** AFSA relies on *Katharine Gibbs* to support its argument that the Rule is invalid because it is not limited in scope to preventing the specific abuses at which it is aimed. We have already distinguished *Katharine Gibbs, see supra* p. 984; whereas in *Katharine Gibbs* the universally applicable remedial refund provisions were unrelated to the abusive enrollment techniques, here the unfair practice is the taking of HHG security interests and wage assignments and the remedy is a prohibition of their use.

ing Officer's observation that the prohibition of HHG security interests may have far-reaching effects. The Presiding Officer's observation, however, was with respect to the household goods provision as it was then drafted. The provision at that time did not contain the narrow definition of household goods that it now does. Thus the Presiding Officer found that "the rule would prohibit the granting of security interests in such broad categories of property as jewelry, expensive luxury items, and, depending upon the purpose of the loan, grants of security interests in real property and personal property not within the commonly accepted definition of household goods." P.O. Report, J.A. at 644. The Commission's inclusion of a precise, narrowly tailored definition of household goods in 16 C.F.R. § 444.1(i) addressed the concerns identified by the Presiding Officer.[40] See 49 Fed.Reg. at 7767–68.

In sum, following a careful review of the Commission's analysis of the record evidence, we find petitioners' challenges unpersuasive. The Commission's decision to proscribe the use of HHG security inter-

ests and wage assignments is supported by substantial evidence in the record and the Commission has neither acted arbitrarily or capriciously nor abused its discretion.

## IV. PREEMPTION OF STATE LAW

▆ Petitioners AFSA and, in particular, SCDCA, claim that the FTC has exceeded its rulemaking authority by "preempting" or "supplanting" the "carefully wrought consumer protection statutes" of those states that either allow or regulate the use of HHG security interests and wage assignments. Although the Magnuson-Moss Act contains no explicit preemption provision, "[i]t has long since been firmly established that state statutes and regulations may be superseded by validly enacted regulations of federal agencies such as the FTC." Katharine Gibbs, 612 F.2d at 667 (citing Free v. Bland, 369 U.S. 663, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962); Spiegel, Inc. v. FTC, 540 F.2d 287, 293 (7th Cir.1976)). The legislative history of the Magnuson-Moss Act and predecessor bills [41] indicate that while Congress did not

---

**40.** AFSA argues that even under the definition of household goods adopted in 16 C.F.R. § 444.1(i), the Rule still prevents consumers from pledging goods which cannot reasonably be deemed necessities such as Gucci shoes, furs, Edwardian breakfronts and Art Nouveau curio cabinets. See AFSA Brief at 23–27. On a practical level, however, we find that the Commission's definition is sufficiently narrow to apply principally to household and personal necessities.

**41.** None of the House or Senate Reports accompanying the Magnuson-Moss Act speak directly to the issue of the intended preemptive effect of the Commission's trade regulation rules. House Report 1107 does, however, speak to preemption in its discussion of another provision of the amendment expanding the language of section 5 to "in or affecting commerce":

The amendments made by 201 will permit more effective regulation of the marketplace by the FTC by placing within its reach unfair or deceptive acts or practices which, although local in character, affect interstate commerce. The expansion of the FTC's jurisdiction made by this section 201 is not intended to occupy the field or in any way to preempt State or local agencies from carrying out consumer protection or other activities within their jurisdiction which are also within the expanded jurisdiction of the Commission.

Where cases of consumer fraud of a local nature which affect commerce are being effectively dealt with by State or local government agencies, it is the Committee's intent that the Federal Trade Commission should not intrude.

H.R.Rep. No. 1107, 93d Cong., 2d Sess. 45 (1974), U.S.Code Cong. & Admin.News 1974, p. 7726. Congress made clear that while it was expanding the FTC's jurisdiction, it did not intend for the FTC to occupy the field of consumer protection or to gratuitously intrude on state or local enforcement activities. Thus states' regulations are only supplanted when inadequate or counterproductive to the Commission's regulations.

Predecessor bills considered by Congress were more explicit with respect to outlining the Commission's intended preemption authority. See, e.g., S. 3201, 91st Cong., 2d Sess. § 106 (1969) (including specific preemption for repugnancy provision), reprinted in S.Rep. No. 1124, 91st Cong., 2d Sess. (1970); S.Rep. No. 269, 92d Cong., 1st Sess. 28 (1971) ("In the course of the Committee's consideration of the Commission's rulemaking power the issue of preemption was discussed. At the present time a Trade Regulation Rule would preempt state legislation or regulation that conflicted."). For a complete review of the legislative history with respect to preemption, see Verkuil, Preemption of State

intend the Commission's regulations to "occupy the field," it did intend FTC rules to have that preemptive effect which flows naturally from a repugnancy between the Commission's valid enactments and state laws. *See id.* at 667 (reaching the same conclusion); Verkuil, *supra* note 40, at 247 ("While the Commission was not given the authority to occupy the field of state unfair competition in consumer protection law, it was authorized to declare by rule preemption of state activities that conflict with regulations.").

In *Katharine Gibbs*, the Second Circuit found the preemption provisions of the Vocational Schools Rule overly broad and thus beyond the Commission's power. 612 F.2d at 667. The preemption provision of the Vocational Schools Rule decreed preemption of any state law or regulation which frustrated the purpose of the Rule's "inadequately spelled out provisions," *see supra* p. 984, thereby potentially preempting "an indefinite variety of state laws and regulations governing the contractual relations between vocational schools and their students." *Katherine Gibbs*, 612 F.2d at 667. The court noted that "[i]f the Commission had defined with specificity the acts or practices it deemed unfair or deceptive, questions of preemption could be answered with relatively little difficulty." *Id.* This court in *American Optometric Ass'n*, found that the Commission had "at least approached the outer boundaries of its authority" where "the Commission's proposed pre-emption of state law [was] almost as thorough as human ingenuity could make it." 626 F.2d at 910. In *American Optometric*, the Commission proposed to preempt the whole field of ophthalmic advertising. These cases recognize only that Congress did not intend for the Commission's regulations "to occupy the field." Hence they do not support petitioners' challenge to preemption in this case, since the Commission has made explicit that "the rule is not intended to occupy the field of credit regulation or to preempt state law in the absence of requirements that are incon-

sistent with the rule." 49 Fed.Reg. at 7783.

In the Statement of Basis and Purpose for the Credit Practices Rule the Commission states:

> The rule has been drafted to be as consistent with existing state laws as possible. Indeed, state laws served as the model for several rule provisions. The rule prohibits practices that are authorized by statute or common law in at least some states. However, none of the rule provisions *preempts* state law by creating an irreconcilable conflict. That is, creditors will be able to comply with both state law and this rule.

*Id.* at 7782 (footnote omitted) (emphasis in original). The Commission further included in the Rule an exemption provision whereby states that offer protections equal to or greater than the Rule can obtain an exemption from the Rule. *See* 16 C.F.R. § 444.5. With respect to the weight to be given the exemption provision, the Fourth Circuit, upholding the FTC's authority to promulgate the Funeral Rule despite state regulation of funeral homes, noted:

> Furthermore, Congress explicitly considered this issue, and provided in Section 19(d) of the Federal Trade Commission Improvements Act of 1980 ... that the existence of state regulation was no barrier to a funeral rule as long as the rule allowed any state to obtain an exemption for its funeral homes by adopting laws that provide protection substantially similar to the federal rule.

*Harry and Bryant Co.*, 726 F.2d at 999. *Cf. Peerless Products, Inc. v. FTC*, 284 F.2d 825, 827 (7th Cir.1960) (FTC "can restrain unfair business practices in interstate commerce even if the activities or industries have been the subject to legislation by a state or even if the intrastate conduct is authorized by state law."), *cert. denied*, 365 U.S. 844, 81 S.Ct. 804, 5 L.Ed.2d 809 (1961)).

■ The Commission in this proceeding considered and modified the Rule to be as

Law by the Federal Trade Commission, 1976

consistent with state laws as possible,[42] explicitly expressed its intent not to occupy the field, and included a provision which allows states providing equal or greater protections to obtain an exemption. Under these circumstances, we cannot agree with petitioners that the Commission has exceeded its authority.

## V. CONCLUSION

After carefully considering each of petitioners' challenges, we conclude that the FTC has not exceeded its authority to promulgate rules proscribing unfair practices under sections 5(a) and 18(a) of the FTC Act. We further find upon a thorough consideration of the record that the Commission's decision to proscribe the taking of HHG security interests and wage assignments is supported by substantial evidence and not arbitrary, capricious or an abuse of discretion. All other arguments advanced by the petitioners, intervenors, and amici were given due consideration and found to be unpersuasive. Accordingly, AFSA's and SCDCA's petitions for review are

*Denied.*

TAMM, Circuit Judge, dissenting:

The Commission's decision to ban security interests in household goods and future earnings is in excess of its statutory authority to regulate unfair trade practices. Although rationalized in terms of "market imperfection" and "consumer choice," the Commission's action reflects nothing more than its paternalistic judgment that lenders should not extend credit to low-income consumers. Such a judgment not only violates the approach to consumer protection outlined in the Policy Statement but also will have the practical effect of forcing needy consumers out of the credit market. I therefore dissent.

## I. INTRODUCTION

Two venerable principles of administrative law control the determination of whether the Commission has exceeded its authority in this case. First, the words "unfair trade practice" set forth a legal standard and must, therefore, gain their final meaning from judicial construction. *FTC v. R.F. Keppel & Bros., Inc.,* 291 U.S. 304, 314, 54 S.Ct. 423, 427, 78 L.Ed. 814 (1934). *See also Office of Communication of the United Church of Christ v. FCC,* 707 F.2d 1413, 1423 (D.C.Cir.1983) ("it is the quintessential function of the reviewing court to interpret legislative delegations of power and to strike down those agency actions that traverse the limits of statutory authority"). Informed judicial construction of the statutory language depends, however, upon "enlightenment gained from administrative experience." *FTC v. Colgate Palmolive Co.,* 380 U.S. 374, 385, 85 S.Ct. 1035, 1042, 13 L.Ed.2d 904 (1965). Courts therefore traditionally accord respect to an interpretation of a statute by the agency charged with its execution. *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969) (such a construction "should be followed unless there are compelling indications that it is wrong, especially when Congress has refused to alter the administrative construction"). Thus, while we "give great weight to the Commission's conclusion," *FTC v. Cement Institute,* 333 U.S. 683, 720, 68 S.Ct. 793, 812, 92 L.Ed. 1010 (1948), "the final word is left to the courts." *Atlantic Refining Co. v. FTC,* 381 U.S. 357, 368, 85 S.Ct. 1498, 1505, 14 L.Ed.2d 443 (1965). *Cf. FTC v. Colgate Palmolive Co.,* 380 U.S. at 385, 85 S.Ct. at 1042 ("[W]hile informed judicial determination is dependent upon enlightenment gained from administrative experience, in the last analysis the words 'deceptive practices' set forth a legal standard and they

---

**42.** For example, the prohibition on the taking of wages assignments was modified to exclude wages already earned at the time of the assignment to eliminate a potential problem in California where certain creditors must take assign-

ments of earned wages to qualify as personal property brokers under state law or to qualify for higher interest rates. *See* 49 Fed.Reg. at 7760; *see also id.* at 7756–57, 7761–62.

must get their final meaning from judicial construction.").

Second, for a reviewing court to determine whether the Commission's exercise of authority has "warrant in the record" and "a reasonable basis in law," *Atlantic Refining Co. v. FTC*, 381 U.S. at 368, 369, 85 S.Ct. at 1505, 1506, the Commission must, of course, articulate the reasons for the choices made. These reasons can be supplied by neither appellate counsel nor the court itself. The Commission's decision-making must be tested by the basis upon which it purports to rest; if the decisions made do not reasonably conform to the policies expressed, the court may not affirm. *See SEC v. Chenery Corp.*, 318 U.S. 80, 95, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943) ("[A]n administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained.").

## II. THE DEFINITION OF "UNFAIR" IN THE POLICY STATEMENT

Application of these basic principles to this case begins with the Commission's 1980 Policy Statement. Issued in response to congressional concern over the extent of the Commission's authority to regulate commerce, the Statement provides an authoritative interpretation of what trade practices can properly be regulated as unfair. The Statement outlines a market-oriented, non-paternalistic test, conditioning Commission intervention in the marketplace upon a finding of a market failure that prevents consumers' purchasing decisions from regulating the market. Once a market failure is identified, the Commission may proscribe practices resulting therefrom that are "injurious in their net effects."

Contrary to the majority's suggestion,[1] the Statement can guide the court in re-

solving the issues raised by petitioners in this case. Although it does not identify what specific conduct constitutes unfair trade practices, the Statement does establish limits to the "Commission's discretion under its unfairness jurisdiction." Federal Trade Commission, *Companion Statement to the Commission's Consumer Unfairness Jurisdiction* 6. As the majority recognizes, the principle limitation placed upon Commission authority is that it cannot, consistent with the Policy Statement, intervene merely because "it believes the market is not producing the 'best deal' for consumers." Majority opinion (Maj. op.) at 982. Determining what "deal" is best for consumers presumes that consumers are unable, without the benevolent guidance of the federal bureaucracy, to make purchasing decisions for themselves. Such a paternalistic approach to consumer protection is "fundamentally incompatible with the liberal assumption that each person is the best judge of his or her own needs." R. Reich, *Toward a New Consumer Protection*, 128 U.Pa.L.Rev. 1, 14 (1979). The Commission instead must "rely on consumer choice—the ability of individual consumers to make their own private purchasing decisions without regulatory intervention—to govern the market." *Policy Statement* at 7. At the same time, "certain types of seller conduct or market imperfections may unjustifiably hinder consumers' free market decisions and prevent the forces of supply and demand from maximizing benefits and minimizing costs." Maj. op. at 976. In such instances of market failure, the Commission may take corrective action "to halt some form of seller behavior that ... takes advantage of an obstacle to the free exercise of consumer decisionmaking." *Policy Statement* at 7.

Because no market responds perfectly to consumer choice, any market could conceiv-

---

1. The majority displays a remarkable ambivalence toward the Policy Statement. The Statement, the majority promises at one point, provides "tangible guideposts for review." Majority opinion (Maj. op.) at 969. It chooses, however, to ignore these guideposts, finding instead that the Policy Statement "falls short of providing any concrete guidance to the court in resolving the issues raised by petitioners in this case," *id.* at 972, and offers no more than "an abstract definition of unfairness." *Id.* at 971.

ably be subject to wholesale Commission regulation. The reviewing court's first task, therefore, is to ensure that the Commission's intervention is a genuine response to a market failure "which prevents free consumer choice from effectuating a self-correcting market," Maj. op. at 981, and not a disguised attempt to impose a paternalistic purchasing decision upon consumers. To perform this task adequately, the court must insist that the Commission sufficiently understand and explain the dynamics of the marketplace. Furthermore, unless the Commission manifests an understanding of how the market responds to consumer choice, it cannot measure the costs and benefits of Commission intervention.

If the Commission has identified with sufficient clarity the impediment that blocks the market's natural allocation, it *may* be appropriate for the Commission to intervene. Whether intervention is appropriate, and if so, what form it should take, can only be answered by weighing the costs and benefits of the Commission's action.[2]

### III. APPLICATION OF THE UNFAIRNESS TEST

#### A. *Market Failure or "Reasonably Avoidable Injury"*

The Commission discusses market failure in terms of what the consumer can "reasonably avoid"; if the consumer can "reasonably avoid" the practice, there is no market imperfection and, hence, no justification for intervention. The most common example of an injury consumers cannot "reasonably avoid" occurs when a seller has failed to disclose a risk involved in the exchange. Although the Commission states that the consumer's ability to shop and bargain for credit remedies is constricted by fine print and technical language, it found not only that consumers generally understand the consequences of default,[3] but that more information would not lead to different consumer decisions. 49 Fed. Reg. at 7746–47. Moreover, while it is true that creditors present standard form credit contracts on a take-it-or-leave-it basis, everyone in this proceeding recognizes that such contracts are the only efficient method of conducting loan transactions. *Id.;* Presiding Officer's Report at 76, J.A. at 410 ("It is, beyond doubt, absolutely necessary to use form contracts in the interests of both creditors and consumers. Without such aids the consumer credit marketplace could not function in a reasonably efficient manner."). Creditors, therefore, do not unfairly take advantage of a market imperfection by imposing upon consumers hidden risks. Discussion by the Commission and the majority about standard form contracts and fine print is thus empty rhetoric, completely irrelevant to the market analysis.

Lacking any evidence of inadequate or undisclosed information that would distort consumer choice, the Commission alternatively concludes that consumer choice is

---

**2.** In reality, two closely related balancing tests must be made. First, the Commission must determine whether the specific trade practice involved actually harms consumers, that is, whether it is "injurious in its net effects." If the benefits of the trade practice to the consumer do not outweigh its costs, the trade practice is unfair. Even the prevention of an unfair practice, however, may not justify federal intervention. Thus, a second, more general, cost-benefit analysis must be made: whether the unfair trade practice can be profitably regulated by the federal government. As the Commission states in its Policy Statement, this includes an assessment of the "burdens on society in general in the form of increased paperwork, increased regulatory burdens on the flow of information, reduced incentives to innovation and capital formation, and similar matters." *Policy State-*

*ment* at 7. Furthermore, as we stated in *American Optometric Ass'n v. FTC,* 626 F.2d 896, 910 (D.C.Cir.1980), "principles of federalism" dictate deference by the Commission to "states' exercise of their police powers." In measuring the general regulatory burden, therefore, the disruptive effect federal regulation would have upon state regulatory schemes must be considered.

**3.** In almost ninety percent of the loan contracts, the household goods taken as collateral are listed on the loan contract. Presiding Officer's Report at 157, J.A. at 489. In such instances, the Commission notes, there is "little question either that a security interest has been given or as to the scope of the coverage." 49 Fed.Reg. at 7762.

restricted because consumers do not have access to standard form contracts that do not contain the provisions in question. This conclusion rests on one of two premises—one factually incorrect, the other theoretically bankrupt.

First, the Commission could mean that consumers generally do not have access to loan contracts without these provisions. This is wrong as a matter of fact. Millions of consumers acquire credit each year without pledging any collateral. Millions more, forced to do business with pawnbrokers or loan sharks, do not even have access to loan contracts *with* these provisions. It is not simply common sense and everyday experience, however, that refutes the Commission's finding. The Presiding Officer found that "[i]t was generally agreed that consumers shopping among different classes of creditors *would find differences in terms* offered by banks as opposed to finance companies." J.A. at 404 (emphasis added).

Second, the Commission could mean that *high-risk* consumers do not have access to loan contracts that do not contain these provisions. Some consumers, to be sure, cannot avoid these provisions in loan contracts, an "obstacle to the free exercise of consumer decisionmaking." *Policy Statement* at 7. This phenomenon reflects a market failure, however, only if one is willing to accept the proposition that the high-risk consumer should be free to choose the same credit as the credit-worthy consumer. Under the Commission's reasoning, since not every driver can choose the lowest insurance premium, by selling more expensive automobile insurance to the high-risk driver, the insurer takes advantage of an "obstacle to free choice." The only obstacle to free choice identified by the Commission is the level of risk the borrower, like the insured, brings to the transaction.

The Commission's analysis of the credit marketplace mocks the approach to consumer protection outlined in the Policy Statement. In the Policy Statement, the Commission asserts that the *status quo* is presumed to be the product of a well-func-

tioning market. In the Credit Practices Rule, the Commission turns this presumption on its head: it proceeds from an *a priori* vision of the mix of options that would be available in a "well-functioning market," and, with little difficulty, concludes that the existing market, which does not provide that mix, is "imperfect." As the majority recognizes, the Statement prevents the Commission from intervening whenever "it believes the market is not producing the 'best deal' for consumers." Maj. op. at 982. Yet this is precisely what the Commission has done in this case. It simply identifies a particular class of consumers (those who cannot avoid loan contracts without security interests in household goods and future earnings) and concludes that those consumers ought to have access to credit without pledging household goods—that is, those consumers ought to have credit at a *better price*.

This is not to suggest that the credit marketplace responds perfectly to consumer choice. To justify its intervention, however, the Commission must at least rationally explain *how* the market fails to respond to consumer choice. Allowing the Commission to intervene when it does not know the "obstacle to free choice" essentially reverses the presumption that each person is the best judge of his or her own needs. Such a paternalistic approach to consumer protection is fundamentally incompatible with the limits imposed upon the Commission's authority in the Policy Statement.

## B. *The Cost-Benefit Analysis*

The Policy Statement's definition of "unfairness" provides that for an unavoidable consumer injury to be unfair, "the injury must not be outweighed by any offsetting consumer or competitive benefits that the sales practice also produces." *Policy Statement* at 6. Business practices entail a mixture of costs and benefits for consumers. Purchase money security agreements in automobiles, for example, can be a great cost to consumers because, upon default, consumers must forfeit the automobile, in

many circumstances a vital necessity, or face costly refinancing agreements. The security agreements cannot be deemed unfair, however, because the benefits of the trade practice—making credit available to those who wish to purchase automobiles—clearly outweigh the costs.

The Commission makes two fatal errors in its cost-benefit analysis of security interests in household goods.[4] First, in measuring the costs of these security interests, the Commission fails to separate the injury *caused by* these creditor practices from the financial and emotional hardships that inevitably accompany default. Second, in evaluating the offsetting benefits of these provisions, the Commission never squarely addresses the single critical question: the extent to which the intended beneficiaries of the Rule depend upon the ability to pledge household goods and future earnings to acquire credit.

### 1. Injury Caused by the Credit Practices

The Commission identifies several harms supposedly "caused by" security interests in household goods. First, household goods are necessities and forfeit of these necessities causes harm to the consumer and his family. This consequence of default, however, is not unique to security interests in household goods. Household goods—indeed houses themselves—can and will still be seized under other permissible credit remedies, such as a home mortgage or a purchase money security interest. Moreover, the Commission found that relinquishing household possessions to a pawnbroker in exchange for credit is not, in fact, "consumer injury."[5] Thus, a lender may hold a borrower's television set from the time a loan is made and keep it if the

borrower defaults. According to the Commission, this is not a consumer injury. If the lender allows the borrower to use the television from the time the loan is made and, in extremely rare circumstances,[6] picks it up when the borrower defaults, he engages in an "unfair" trade practice.

Second, the Commission states that the threat of losing household goods increases the likelihood that debtors will forego valid defenses. The credit practices still available to creditors, particularly purchase money security interests, however, pose a far greater risk that debtors will forego valid legal defenses. The creditor who sells defective household goods, for example, is subject to a much greater array of defenses than is the creditor who simply loans money.

Third, the Commission states that the threat of repossession may cause the consumer to default improvidently on other loans to avoid repossession of his household goods. Defaulting on another loan, however, could only be "improvident" if the creditor remedies of that other loan were *more* onerous than the remedies threatened by the creditor. If this other loan has more onerous creditor remedies, it is difficult to see the marginal cost of these less onerous creditor provisions. If, on the other hand, the creditor remedies under this other loan are less onerous (a much more likely situation), it is not unwise to default. Moreover, the recognition that the threat of repossession may cause the debtor to choose to default on another loan is fundamentally inconsistent with the Commission's entire notion of the causes of consumer default. In determining whether the trade practice is unavoidable, the Commission states that default is beyond the debtor's control. On the other hand, in

4. Much of the criticism leveled at the cost-benefit analysis of household goods security interests also applies to the Commission's cost-benefit analysis of security interests in future earnings. I do not specifically address the latter, however, because the practice is already thoroughly regulated in the states where it is commonplace. *See* 49 Fed.Reg. at 7756.

5. 49 Fed.Reg. at 7767 ("[t]he record furnishes no evidence" that giving a pawnbroker a possessory security interest "cause[s] any injury").

6. As the Commission recognizes, defaults occur in only a fraction of transactions, and actual seizure occurs in but a "tiny fraction" of defaults. Brief for Respondent at 21; 49 Fed.Reg. at 7763.

assessing the marginal cost of the trade practice, the Commission assumes that consumers faced with repossession will deliberately default on a loan not so secured to minimize their losses. The Commission cannot have it both ways.

Finally, the Commission states that the "unique" threat of repossession of household goods causes consumers to enter into costly refinance arrangements. The Commission contends that these horrible agreements "may reduce or defer monthly payments on a short-term basis ... at the cost of increasing the consumer's total long-term debt obligation." Maj. op. at 974. *See* 49 Fed.Reg. at 7764–65. A creditor, therefore, unfairly takes advantage of a market imperfection by refusing to discharge debtors' contractual obligations unilaterally or by refusing to lend more money free of charge. Until the Commission can wish into being a world in which debtors do not owe money and the use of money is free, the courts should require, I think, a less fatuous approach to consumer protection.

The economic hardships that inevitably accompany indebtedness and default will remain despite the prohibition of these creditor remedies. The Commission, therefore, grossly exaggerates the beneficial impact of the Rule. The Rule does not eliminate the need for credit, does not provide debtors with any more cash with which to discharge obligations, does not make default a less likely occurrence, does not relieve the financial and emotional hardships that accompany default, does not insulate household necessities from forfeit, does not protect consumers from unscrupulous lenders intent in any event upon breaking the law, and does not lessen the compounding burden unpaid debts place upon debtors.

### 2. Offsetting Benefits

Security interests in household goods benefit consumers to the extent that they enable consumers to acquire credit without resorting to the pawnbroker or the loan shark. The Commission, however, never squarely addresses whether any consumers' access to credit depends upon their ability to pledge household goods as collateral.[7] Instead, it evaluates the impact of the Rule—not upon the high-risk consumer it purports to protect—but upon the creditworthy consumer who needs no protection from these "abusive" credit practices in the first instance.

The Presiding Officer considered this question and came to the following conclusion:

> However, this record does support the conclusion that the ability to take household goods as security is of very great importance to finance company creditors and that loss of this right would *undoubtedly have a very considerable impact on their operations and upon the availability of credit to consumers.*

Presiding Officer's Report at 162, J.A. at 494 (emphasis added). In a feeble attempt to weaken the force of the Presiding Officer's conclusions, the Commission states that the definition of "household goods," narrowed since the Officer's report, would address the problems of availability. Thus, the Commission notes, under the new definition of "household goods," consumers may still pledge works of art, antiques, jewelry, video tape recorders, home computers, and the like. Similarly, the Commission puts great stock in the finding that forty percent of finance company clients are homeowners and therefore have other assets to pledge. Furthermore, the Commission states, banks, which seldom take

---

**7.** The majority seems to place great weight on the econometric analysis conducted by various participants in the rulemakings, evidence which "by all accounts, contains deficiencies which prevent definitive answers." Maj. op. at 987. In spite of these deficiencies, however, the majority insists that the evidence reveals that the Credit Practices Rule "would have only a marginal impact on the cost or availability of cred-

it." *Id.* at 33. What is "marginal" apparently is in the eyes of the beholder. The econometric studies revealed that the Credit Practices Rule would cost in 1979 between $623 million and $10.6 billion in increased interest rates. J.A. at 1528. I would agree, however, that the Rule has a *"marginal"* impact on credit availability: that is, those consumers currently at the *margin* will be forced out of the credit marketplace.

security interests in household goods or future earnings, remain available to the consumer.

What happened to the high-risk consumer the Commission so vividly describes when assessing the hardships caused by the creditor remedies? That consumer owned household goods of "little or no value." He had no cash with which to pay back the loan, no assets to liquidate to prevent the forfeiture of household necessities or the imposition of "costly refinancing arrangements." In assessing the impact of the Rule upon the availability of credit, the Commission converts the distraught debtor into a homeowner, able to acquire credit without pledging his household goods because he can always visit his suburban bank or pledge his handy Matisse. The problem with the Commission's analysis is that the Rule unfortunately does not make the poor rich, or the high-risk consumer credit worthy. The Commission proves only that security interests in household goods cost the high-risk consumer more than they benefit the credit-worthy consumer.

Rather than address the Presiding Officer's conclusions, the Commission wishfully insists that creditors *should* extend credit to low-income, high-risk consumers without requiring from them security interests in household goods. 49 Fed.Reg. at 7766. Such security interests are of no real value to the creditor, the Commission reasons, because they do not deter default. Default cannot be deterred by security interests because it flows from circumstances beyond the debtor's control. This is nonsense on stilts. First, according to the record, twenty-five to thirty percent of defaulting debtors do so because of circumstances *within* their control. Five percent default because of "debtor irresponsibility"; twenty-five percent because of "voluntary overextension." *Id.* at 7748. The Commission never considers, however, whether eliminating these security interests would increase the number of debtors who default because of "voluntary overextension" or "debtor irresponsibility."

Second, even if every default occurred for reasons beyond the debtor's control, the Commission's conclusion that security interests do not deter default is a mammoth non sequitur. The Commission's reasoning is this: household goods security interests do not deter those who default; therefore, by eliminating the security interest the rate of default will not increase. By the Commission's logic, the existence of criminal laws does not deter those who violate the law. Can we therefore repeal the criminal laws and expect no impact upon crime? Of course not; just as we evaluate the impact of criminal laws upon those who do not violate the law, so must we evaluate the impact of security interests upon those who do not default. As the Commission found, a majority of consumers face financial trauma that could result in a default. 49 Fed.Reg. at 7748. Yet only a small number of consumers actually default. *Id.* This disparity is explained to some extent by the varying degrees of financial trauma that individual consumers undergo. Unrebutted evidence in the record and a healthy dose of common sense also suggest, however, that the more equity a debtor has in collateral the less likely he is to default. *See* Bureau of Social Science Research, *Federal Trade Commission Proposals for Credit Contract Regulations and the Availability of Consumer Credit* 129, J.A. at 1518 (the ratio of the value of collateral to the size of the loan "is the principle determinant of the probability of default"). If, as common sense and record evidence suggest, security interests in household goods do deter default, lenders will rationally refuse to extend credit to at least some consumers who have no other assets to pledge. *See* Presiding Officer's Report 162, J.A. at 494 (elimination of household goods security interests "would undoubtedly have a very considerable impact ... upon the availability of credit"). Derailed by its faulty logic, the Commission never makes the critical finding of how many low-income consumers, the intended beneficiaries of the Rule, will be unable, because of the Credit Practices Rule, to obtain credit.

## IV. CONCLUSION

The flaws in the Commission's analysis form an intriguing pattern, a pattern resulting from the imperfect superimposition of the "market failure" and "consumer choice" rationale upon a simple, paternalistic judgment: those whose access to credit depends upon the pledge of meager household goods and future earnings would be better off if creditors were unable and unwilling to extend to them credit. If this is the rationale underlying the Rule, most, if not all, inconsistencies in logic and shortcomings in evidence disappear. The imperfections of the marketplace need not be understood because it is not the obstacle to free choice that the Commission wishes to prevent but the free exercise thereof. Similarly, the harms caused by these practices need not be separated from the harms that inevitably accompany default because, if excluded from the credit marketplace altogether, these consumers will avoid not only these security interests but also all the other attendant hardships of default. Consumers who do not seek credit will, of course, avoid "costly refinance agreements" and never default "improvidently" on other loans. The Commission need not evaluate the impact of the Rule upon the intended beneficiary because the intended beneficiary, in its benevolent judgment, should not be seeking credit in the first instance.

The consumer law specialists involved in this case have at least been forthright in their support of the Credit Practices Rule. People who must pledge household goods or future earnings to acquire credit, they testified, would be better off without credit. Presiding Officer's Report at 162, J.A. at 484. Although held with genuine compassion, this belief cannot form the basis for the decision. First, it assumes that government intervention will eliminate the need for credit and that these people will not find credit elsewhere. Credit will be made available to them, however, by the pawnbroker or, worse, the loan shark, whose "creditor remedies" are infinitely more severe than those banned by the decision. Second, *"these people" are not children.* To suggest that "they" are incapable of making such decisions for themselves replaces healthy respect for the choice of the individual with unwarranted confidence in the wisdom of those who happen to be in power. Aware that such an approach to consumer protection is antagonistic to the basic principles outlined in the Policy Statement submitted to Congress, the Commission has couched its purely paternalistic judgment in terms of the market failure and cost-benefit analysis with enough skill to sneak past a court anesthetized by a misplaced deference to agency authority. If judicial review is to have any meaning, however, agency action must be tested by the basis upon which it purports to rest and not by an agenda hidden from the court. *See SEC v. Chenery Corp.*, 318 U.S. 80, 95, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943). Tested against the approach to consumer protection outlined in the Policy Statement, the Commission's decisionmaking must fail. I therefore respectfully dissent.

